CORRIGAN, J.
The issue presented in this case is whether the public has a right to walk along the shores of the Great Lakes where a private landowner ostensibly holds title to the water’s edge. To resolve this issue we must consider two component questions: (1) how the public trust doctrine affects private littoral[1] title; and (2) whether the public trust encompasses walking among the public rights protected by the public trust doctrine.
Despite the competing legal theory offered by Justice MARKMAN, our Court unanimously agrees that plaintiff does not interfere with defendants’ property rights when she walks within the area of the public trust. Yet we decline to insist, as do Justices MARKMAN and YOUNG, that submersion[2] at a given moment defines the bound *673 ary of the public trust. Similarly, we cannot leave uncorrected the Court of Appeals award to littoral landowners of a “right of exclusive use” down to the water’s edge, which upset the balance between private title and public rights along our Great Lakes and disrupted a previously quiet status quo.
Plaintiff Joan Glass asserts that she has the right to walk along Lake Huron. Littoral landowners defendants Richard and Kathleen Goeckel maintain that plaintiff trespasses on their private land when she walks the shoreline. Plaintiff argues that the public trust doctrine, which is a legal principle as old as the common law itself, and the Great Lakes Submerged Lands Act (GLSLA), MCL 324.32501 et seq.,[3] protect her right to walk along the shore of Lake Huron unimpeded by the private title of littoral landowners. Plaintiff contends that the public trust doctrine and the GLSLA preserve public rights in the Great Lakes and their shores that limit any private property rights enjoyed by defendants.
Although we find plaintiffs reliance on the GLSLA misplaced, we conclude that the public trust doctrine does protect her right to walk along the shores of the Great Lakes. American law has long recognized that large bodies of navigable water, such as the oceans, are natural resources and thoroughfares that belong to the public. In our common-law tradition, the state, as sovereign, acts as trustee of public rights in these natural resources. Consequently, the state lacks the power to diminish those rights when conveying littoral property to private parties. This “public trust doctrine,” as the United States Supreme Court stated in Illinois *674 Central RCov Illinois, 146 US 387, 435; 13 S Ct 110; 36 L Ed 1018 (1892) (Illinois Central I), and as recognized by our Court in Nedtweg v Wallace, 237 Mich 14, 16-23; 208 NW 51 (1926), applies not only to the oceans, but also to the Great Lakes.
Pursuant to this longstanding doctrine, when the state (or entities that predated our state’s admission to the Union) conveyed littoral property to private parties, that property remained subject to the public trust. In this case, the property now owned by defendants was originally conveyed subject to specific public trust rights in Lake Huron and its shores up to the ordinary high water mark. The ordinary high water mark lies, as described by Wisconsin, another Great Lakes state, where “ ‘the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic.’ ” State v Trudeau, 139 Wis 2d 91, 102; 408 NW2d 337 (1987) (citation omitted).[4] Consequently, although defendants retain full rights of ownership in their littoral property, they hold these rights subject to the public trust.
We hold, therefore, that defendants cannot prevent plaintiff from enjoying the rights preserved by the public trust doctrine. Because walking along the lake-shore is inherent in the exercise of traditionally protected public rights of fishing, hunting, and navigation, our public trust doctrine permits pedestrian use of our Great Lakes, up to and including the land below the *675 ordinary high water mark. Therefore, plaintiff, like any member of the public, enjoys the right to walk along the shore of Lake Huron on land lakeward of the ordinary high water mark. Accordingly, we reverse the judgment of the Court of Appeals and remand this case to the trial court for further proceedings consistent with this opinion.
FACTS AND PROCEDURAL HISTORY
Defendants own property on the shore of Lake Huron, and their deed defines one boundary as “the meander line of Lake Huron.”[5] Plaintiff owns property located across the highway from defendants’ lakefront home. This case originally arose as a dispute over an express easement. Plaintiffs deed provides for a fifteen-foot easement across defendants’ property “for ingress and egress to Lake Huron,” and she asserts that she and her family members have used the easement consistently since 1967 to gain access to the lake. The parties have since resolved their dispute about plaintiffs use of that easement.
This present appeal concerns a different issue: plaintiffs right as a member of the public to walk along the shoreline of Lake Huron, irrespective of defendants’ private title. During the proceedings below, plaintiff sought to enjoin defendants from interfering with her walking along the shoreline. Defendants sought summary disposition under MCR 2.116(C)(8) and (9), for failure to state a claim upon which relief may be *676 granted and for failure to state a defense. Defendants argued that, as a matter of law, plaintiff could not walk on defendants’ property between the ordinary high water mark and the lake without defendants’ permission.
The trial court granted plaintiff summary disposition under MCR 2.116(1) (2). Although the court concluded that no clear precedent controls resolution of the issue, it held that plaintiff had the right to walk “lakewards of the natural ordinary high water mark” as defined by the GLSLA.
The Court of Appeals reversed the trial court’s order in a published opinion. 262 Mich App 29; 683 NW2d 719 (2004). It stated “[t]hat the state of Michigan holds in trust the submerged lands beneath the Great Lakes within its borders for the free and uninterrupted navigation of the public . ...” Id. at 42. The Court held that, apart from navigational issues, the state holds title to previously submerged land, subject to the exclusive use of the riparian owner up to the water’s edge. Id. at 43. Thus, under the Court of Appeals analysis, neither plaintiff nor any other member of the public has a right to traverse the land between the statutory ordinary high water mark and the literal water’s edge.
We subsequently granted leave to appeal. 471 Mich 904 (2004).
STANDARD OF REVIEW
We review de novo the grant or denial of a motion for summary disposition. Maiden v Rozwood, 461 Mich 109, 118; 597 NW2d 817 (1999). In a motion under MCR 2.116(C)(8), “[a]ll well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant.” Maiden, supra at 119. As we stated in Nasser v Auto Club Ins Ass’n, 435 Mich 33, 47; 457 *677 NW2d 637 (1990), “a motion for summary disposition under MCR 2.116(C)(9) is tested solely by reference to the parties’ pleadings.”
ANALYSIS
I. THE HISTORY OF THE PUBLIC TRUST DOCTRINE
Throughout the history of American law as descended from English common law, our courts have recognized that the sovereign must preserve and protect navigable waters for its people. This obligation traces back to the Roman Emperor Justinian, whose Institutes provided, “Now the things which are, by natural law, common to all are these: the air, running water, the sea, and therefore the seashores. Thus, no one is barred access to the seashore....” Justinian, Institutes, book II, title I, § 1, as translated in Thomas, The Institutes of Justinian, Text, Translation and Commentary (Amsterdam: North-Holland Publishing Company, 1975), p 65; see also 9 Powell, Real Property, § 65.03(2), p 65-39 n 2, quoting a different translation. The law of the sea, as developed through English common law, incorporated the understanding that
both the title and the dominion of the sea, and of rivers and arms of the sea, where the tide ebbs and flows, and of all the lands below high water mark, within the jurisdiction of the Crown of England, are in the King. Such waters, and the lands which they cover, either at all times, or at least when the tide is in, are incapable of ordinary and private occupation, cultivation and improvement; and their natural and primary uses are public in their nature, for highways of navigation and commerce, domestic and foreign, and for the purpose of fishing by all the King’s subjects. Therefore the title, jus privatum, in such lands . .. belongs to the King as the sovereign; and the dominion thereof, jus publicum, is vested in him as the representative of the *678 nation and for the public benefit. [Shively v Bowlby, 152 US 1, 11; 14 S Ct 548; 38 L Ed 331 (1894).]
This rule — that the sovereign must sedulously guard the public’s interest in the seas for navigation and fishing — passed from English courts to the American colonies, to the Northwest Territory, and, ultimately, to Michigan. See Nedtweg, supra at 17; accord Phillips Petroleum Co v Mississippi, 484 US 469, 473-474; 108 S Ct 791; 98 L Ed 2d 877 (1988), quoting Shively, supra at 57.
Michigan’s courts recognized that the principles that guaranteed public rights in the seas apply with equal force to the Great Lakes. Thus, we have held that the common law of the sea applies to the Great Lakes. See Hilt v Weber, 252 Mich 198, 213, 217; 233 NW 159 (1930); People v Silberwood, 110 Mich 103, 108; 67 NW 1087 (1896). In particular, we have held that the public trust doctrine from the common law of the sea applies to the Great Lakes.[6] See Nedtweg, supra at 16-23; Silberwood, supra at 108; State v Venice of America Land Co, 160 Mich 680, 702; 125 NW 770 (1910); accord Illinois Central I, supra at 437.
Accordingly, under longstanding principles of Michigan’s common law, the state, as sovereign, has an obligation to protect and preserve the waters of the Great Lakes and the lands beneath them for the public.[7] *679 The state serves, in effect, as the trustee of public rights in the Great Lakes for fishing, hunting, and boating for commerce or pleasure. See Nedtweg, supra at 16; Venice of America Land Co, supra at 702; State v Lake St Clair Fishing & Shooting Club, 127 Mich 580, 586; 87 NW 117 (1901); Lincoln v Davis, 53 Mich 375, 388; 19 NW 103 (1884).
The state, as sovereign, cannot relinquish this duty to preserve public rights in the Great Lakes and their natural resources. As we stated in Nedtweg, supra at 17:
The State may not, by grant, surrender such public rights any more than it can abdicate the police power or other essential power of government. But this does not mean that the State must, at all times, remain the proprietor of, as well as the sovereign over, the soil underlying navigable waters.... The State of Michigan has an undoubted right to make use of its proprietary ownership of the land in question, [subject only to the paramount right of] the public [to] enjoy the benefit of the trust.
Therefore, although the state retains the authority to convey lakefront property to private parties, it necessarily conveys such property subject to the public trust.
At common law, our courts articulated a distinction between jus privatum and jus publicum to capture this principle: the alienation of littoral property to private parties leaves intact public rights in the lake and its submerged land. See Nedtweg, supra at 20; McMorran Milling Co v C H Little Co, 201 Mich 301, 313; 167 NW 990 (1918); Sterling v Jackson, 69 Mich 488, 506-507; 37 NW 845 (1888) (CAMPBELL, J., dissenting); see also Collins v Gerhardt, 237 Mich 38, 55; 211 NW 115 (1926) *680 (FELLOWS, J., concurring) (recognizing the “different character” of the rights held by the federal government as proprietor and as trustee in an inland navigable stream); Lorman v Benson, 8 Mich 18, 27-28 (1860) (reciting the common-law distinction between jus publicum and jus privatum in a case involving ownership of a riverbed).[8]
Jus publicum refers to public rights in navigable waters and the land covered by those waters;[9] jus privatum, in contrast, refers to private property rights held subject to the public trust.[10] As the United States Supreme Court explained in Shively, supra at 13:
,. In England, from the time of Lord Hale, it has been treated as settled that the title in the soil of the sea, or of arms of the sea, below the ordinary high water mark, is in the King, except so far as an individual or a corporation has acquired rights in it by express grant or by prescription or usage; and that this title, jus privatum, whether in the King or in a subject, is held subject to the public right, jus publicum, of navigation and fishing. [Citations omitted.]
*681 Thus, when a private party acquires littoral property from the sovereign, it acquires only the jus privatum. Our courts have continued to recognize this distinction between private title and public rights when they have applied the public trust doctrine. Public rights in certain types of access to the waters and lands beneath them remain under the protection of the state. Under the public trust doctrine, the sovereign never had the power to eliminate those rights, so any subsequent conveyances of littoral property remain subject to those public rights. See Nedtweg, supra at 17; see also People ex rel Director of Conservation v Broedell, 365 Mich 201, 205; 112 NW2d 517 (1961). Consequently, littoral landowners have always taken title subject to the limitation of public rights preserved under the public trust doctrine.
II. THE SCOPE OF THE PUBLIC TRUST DOCTRINE
Having established that the public trust doctrine is alive and well in Michigan, we are required in this appeal to examine the scope of the doctrine in Michigan: whether it extends up to the ordinary high water mark or whether, as defendants argue, it applies only to land that is actually below the waters of the Great Lakes at any particular moment.
A. THE GREAT LAKES SUBMERGED LANDS ACT
Plaintiff argues that the Legislature defined the scope of the public trust doctrine and established the outer limits of the doctrine in the GLSLA, thus supplanting our case law. This act, according to plaintiff, manifests a legislative intent to claim all land lakeward of the ordinary high water mark. Thus, plaintiff claims that the public trust extends to all land below the ordinary high water mark as defined in the act, which states that “the ordinary high-water mark shall be at the following elevations above sea level, international *682 Great Lakes datum of 1955: Lake Superior, 601.5 feet; Lakes Michigan and Huron, 579.8 feet; Lake St. Clair, 574.7 feet; and Lake Erie, 571.6 feet.” MCL 324.32502.
We find plaintiffs reliance on the GLSLA to be misplaced. First, the act does not show a legislative intent to take title to all land lakeward of the ordinary high water mark. MCL 324.32502 provides:
The lands covered and affected by this part are all of the unpatented lake bottomlands and unpatented made lands in the Great Lakes, including the bays and harbors of the Great Lakes, belonging to the state or held in trust by it, including those lands that have been artificially filled in. The waters covered and affected by this part are all of the waters of the Great Lakes within the boundaries of the state. This part shall be construed so as to preserve and protect the interests of the general public in the lands and waters described in this section, to provide for the sale, lease, exchange, or other disposition of unpatented lands and the private or public use of waters over patented and unpatented lands, and to permit the filling in of patented submerged lands whenever it is determined by the department that the private or public use of those lands and waters will not substantially affect the public use of those lands and waters for hunting, fishing, swimming, pleasure boating, or navigation or that the public trust in the state will not be impaired by those agreements for use, sales, lease, or other disposition. The word “land” or “lands” as used in this part refers to the aforesaid described unpatented lake bottomlands and unpatented made lands and patented lands in the Great Lakes and the bays and harbors of the Great Lakes lying below and lakeward of the natural ordinary high-water mark, but this part does not affect property rights secured by virtue of a swamp land grant or rights acquired by accretions occurring through natural means or reliction. For purposes of this part, the ordinary high-water mark shall be at the following elevations above sea level, international Great Lakes datum of 1955: Lake Superior, 601.5 feet; Lakes Michigan and Huron, 579.8 feet; Lake St. Clair, 574.7 feet: and Lake Erie, 571.6 feet.
*683 The first sentence of this section states that the act applies only to “unpatented lake bottomlands” and “unpatented made lands.” The fourth sentence, however, defines “land” or “lands” in the act as including not only the bottomlands and made lands described in the first sentence, but also “patented lands in the Great Lakes and the bays and harbors of the Great Lakes lying below and lakeward of the natural ordinary high-water mark----”[11] Thus, the act covers both publicly owned land (the lake bottomlands and made lands described in the first sentence) and privately owned land that was once owned by the state (patented land below the ordinary high water mark). In other words, the act reiterates the state’s authority as trustee of the inalienable jus publicum, which extends over both publicly and privately owned lands. The act makes no claims to alter the delineation of the jus privatum of individual landowners.
Moreover, the act never purports to establish the boundaries of the public trust. Rather, the GLSLA establishes the scope of the regulatory authority that the Legislature exercises, pursuant to the public trust doctrine. Indeed, most sections of the act merely regulate the use of land below the ordinary high water mark.[12] *684 The only section of the act that purports to deal with property rights is § 32511, MCL 324.32511:
A riparian owner may apply to the department for a certificate suitable for recording indicating the location of his or her lakeward boundary or indicating that the land involved has accreted to his or her property as a result of natural accretions or placement of a lawful, permanent structure. The application shall be accompanied by a fee of $200.00 and proof of upland ownership.
As shown previously, a vital distinction in public trust law exists between private title (jus privatum) and those public rights that limit that title (jus publicum). Section 32511 only establishes a mechanism for landowners to certify the boundary of their private property (jus privatum). The boundary of the public trust (jus publicum) — distinct from a boundary on private littoral title — remains a separate question, a question that the act does not answer.
Finally, plaintiff also relies on the following language in § 32502 to argue that the GLSLA establishes the scope of the public trust doctrine:
This part [the GLSLA] shall be construed so as to preserve and protect the interests of the general public in the lands and waters described in this section, to provide for the sale, lease, exchange, or other disposition of unpatented lands and the private or public use of waters over *685 patented and unpatented lands, and to permit the filling in of patented submerged lands whenever it is determined by the department that the private or public use of those lands and waters will not substantially affect the public use of those lands and waters for hunting, fishing, swimming, pleasure boating, or navigation or that the public trust in the state will not be impaired by those agreements for use, sales, lease, or other disposition.[13]
Again, plaintiffs reliance on this section is misplaced. This sentence states that the act will be construed to protect the public interest. But that rule of construction begs the question and cannot resolve whether the public has an interest in a littoral property in the first place. It provides no reason to expand the public trust beyond the limits established at common law. Thus, we must look elsewhere to determine the precise scope of the public trust to which § 32502 refers.[14]
B. THE PUBLIC TRUST DOCTRINE AS APPLIED TO THE GREAT LAKES
Because the GLSLA does not define the scope of the public trust doctrine in Michigan, we must turn again to our common law.
In applying the public trust doctrine to the oceans, courts have traditionally held that rights protected by this doctrine extend from the waters themselves and the lands beneath them to a point on the shore called *686 the “ordinary high water mark.” See, e.g., Shively, supra at 13; Hardin v Jordan, 140 US 371, 381; 11 S Ct 808; 35 L Ed 428 (1891); see also Hargrave’s Law Tracts, 11, 12, quoted in Shively, supra at 12 (“ ‘The shore is that ground that is between the ordinary high water and low water mark [and this ground belongs to the sovereign.]’ ”). The United States Supreme Court described this common-law concept of the “high water mark” in Borax Consolidated, Ltd v Los Angeles, 296 US 10, 22-23; 56 S Ct 23; 80 L Ed 9 (1935):
The tideland extends to the high water mark. This does not mean ... a physical mark made upon the ground by the waters; it means the line of high water as determined by the course of the tides. By the civil law, the shore extends as far as the highest waves reach in winter. But by the common law, the shore “is confined to the flux and reflux of the sea at ordinary tides.” It is the land “between ordinary high and low-water mark, the land over which the daily tides ebb and flow. When, therefore, the sea, or a bay, is named as a boundary, the line of ordinary high-water mark . is always intended where the common law prevails.” [Citations omitted.]
An “ordinary high water mark” therefore has an intuitive meaning when applied to tidal waters. Because of lunar influence, ocean waves ebb and flow, thus reaching one point on the shore at low tide and reaching a more landward point at high tide. The latter constitutes the high water mark on a tidal shore. The land between this mark and the low water mark is submerged on a regular basis, and so remains subject to the public trust doctrine as “submerged land.” See, e.g., Illinois Central R Cov Chicago, 176 US 646, 660; 20 S Ct 509; 44 L Ed 622 (1900) (Illinois Central II) (“But it is equally well settled that, in the absence of any local statute or usage, a grant of lands by the State does not pass title to submerged lands below [the] high water mark ....”). (Citations omitted; emphasis added.)
*687 Michigan’s courts have adopted the ordinary high water mark as the landward boundary of the public trust. For example, in an eminent domain case concerning property on a bay of Lake Michigan, we held that public rights end at the ordinary high water mark. Peterman v Dep’t of Natural Resources, 446 Mich 177, 198-199; 521 NW2d 499 (1994).[15] Thus, we awarded damages for destruction of the plaintiffs property above the ordinary high water mark that resulted from construction by the state (which occurred undisputedly in the water and within the public trust). Id. Similarly, in an earlier case where the state asserted its control under the public trust doctrine over a portion of littoral property, the Court also employed the high water mark as the boundary of the public trust. Venice of America Land Co, supra at 701-702.
Our Court has previously suggested that Michigan law leaves some ambiguity regarding whether the high or low water mark serves as the boundary, of the public trust. See Broedell, supra at 205-206. But the established distinction in public trust jurisprudence between public rights (jus publicum) and private title (jus privatum) resolves this apparent ambiguity. Cases that seem to suggest, at first blush, that the public trust ends at the low water mark actually considered the boundary of the littoral owner’s private property (jus privatum) rather than the boundary of the public trust (jus publicum).[16] Because the public trust doctrine *688 preserves public rights separate from a landowner’s fee title, the boundary of the public trust need not equate with the boundary of a landowner’s littoral title. Rather, a landowner’s littoral title might extend past the boundary of the public trust.[17] Our case law no *689 where suggests that private title necessarily ends where public rights begin. To the contrary, the distinction we have drawn between private title and public rights demonstrates that the jus privatum and the jus publicum may overlap.
Nor does this recognition of the potential for overlap represent a novel invention. While not binding on Michigan, other courts have similarly accommodated the same practical challenge of fixing boundaries on shifting waters: they acknowledged the possibility of public rights coextensive with private title. See, e.g., State v Korrer, 127 Minn 60, 76; 148 NW 617 (1914) (Even if a riparian owner holds title to the ordinary low water mark, his title is absolute only to the ordinary high water mark and the intervening shore space between high and low water mark remains subject to the rights of the public.); see also North Shore, Inc v Wakefield, 530 NW2d 297, 301 (ND, 1995) (stating that neither the state nor the riparian owner held absolute interests between high and low water mark); Shaffer v Baylor’s Lake Ass’n, Inc, 392 Pa 493, 496; 141 A2d 583 (1958) (subjecting private title held to low water mark to public rights up to high water mark); Flisrand v Madson, 35 SD 457, 470-472; 152 NW 796 (1915) (same as Korrer, supra); Bess v Humboldt Co, 3 Cal App 4th 1544, 1549; 5 Cal Rptr 2d 399 (1992) (noting that it is “well established” that riparian title to the low water mark remained subject to the public trust between high and low water marks).
In the instant case, the Court of Appeals relied extensively on Hilt to set a boundary on where defendants’ property ended and where plaintiffs rights (as a member of the public) began. But our concern in Hilt was the boundary of a littoral landowner’s private *690 title,[18] rather than the boundary of the public trust. See Hilt, supra at 206 (noting that the government conveyed title “to the water’s edge”). Indeed, the Hilt Court endorsed the Nedtweg Court’s discussion of the public trust and decided the issue of the boundary on private littoral title within the context of the public trust doctrine. See id. at 203, 224-225, 227.[19] Consequently, the Court of Appeals erred by granting defendants an exclusive right of use down to the water’s edge, because littoral property remains subject to the public trust and because defendants hold title according to the terms of their deed.
Our public trust doctrine employs a term, “the ordinary high water mark,” from the common law of the sea and applies it to our Great Lakes. While this term has an obvious meaning when applied to tidal waters with regularly recurring high and low tides, its application to nontidal waters like the Great Lakes is less apparent. See, e.g., Lincoln, supra at 385 (noting, amidst a discussion of the extent of private littoral title, some imperfection in an analogy between the Great Lakes and the oceans). In the Great Lakes, water levels change because of precipitation, barometric pressure, and other forces that lack the regularity of lunar tides, *691 which themselves exert a less noticeable influence on the Great Lakes than on the oceans. Applying a term from the common law of the sea, despite the obvious difference between the oceans and the Great Lakes, has led to some apparent discontinuity in the terminology employed in our case law. Notwithstanding some prior imprecision in its use, a term such as “ordinary high water mark” attempts to encapsulate the fact that water levels in the Great Lakes fluctuate. This fluctuation results in temporary exposure of land that may then remain exposed above where water currently lies. This land, although not immediately and presently submerged, falls within the ambit of the public trust because the lake has not permanently receded from that point and may yet again exert its influence up to that point. See Nedtweg, supra at 37 (setting apart from the public trust that land which is permanently exposed by the “recession of water” and so “rendered suitable for human occupation”). Thus, the ordinary high water mark still has meaning as applied to the Great Lakes and marks the boundary of land, even if not instantaneously submerged, included within the public trust. Our sister state, Wisconsin, defines the ordinary high water mark as
the point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic. And where the bank or shore at any particular place is of such a character that it is impossible or difficult to ascertain where the point of ordinary high-water mark is, recourse may be had to other places on the bank or shore of the same stream or lake to determine whether a given stage of water is above or below ordinary high-water mark. [Diana Shooting Club v Husting, 156 Wis 261, 272; 145 NW 816 (1914) (citation omitted).]
*692 Although Diana Shooting Club involved a river, Wisconsin has applied this definition not only to inland waters, but also to the Great Lakes. See R W Docks & Slips, supra at 508-510; Trudeau, supra at 102.[20] This definition has long served a state with which we share a border and that also has an extensive Great Lakes shoreline.
Although we do not import our sister state’s public trust doctrine where this Court has already spoken, we are persuaded to adopt this definition to clarify a term long used but little defined in our jurisprudence. Indeed, Wisconsin’s definition of ordinary high water mark is not far removed from meanings previously recognized in Michigan. See MCL 324.30101(i);[21] 1999 *693 AC, R 281.301(j); Peterman, supra at 198 n 29 (noting a statutory definition regarding inland waters, now enacted as MCL 324.30101[i], when considering the ordinary high water mark on Lake Michigan). This definition also parallels that employed by the federal government. See, e.g., 33 CFR 328.3(e).[22] Thus, we clarify the meaning of “ordinary high water mark” consistently with a definition that has served another Great Lakes state for some hundred years and is in accord with the term’s limited development in our own state.
The concepts behind the term “ordinary high water mark” have remained constant since the state first entered the Union up to the present: boundaries on water are dynamic and water levels in the Great Lakes fluctuate.[23] In light of this, the aforementioned factors *694 will serve to identify the ordinary high water mark, but the precise location of the ordinary high water mark at any given site on the shores of our Great Lakes remains a question of fact.
III. THE PUBLIC TRUST INCLUDES WALKING WITHIN ITS BOUNDARIES
We have established thus far that the private title of littoral landowners remains subject to the public trust beneath the ordinary high water mark. But plaintiff, as a member of the public, may walk below the ordinary high water mark only if that practice receives the protection of the public trust doctrine. We hold that walking along the shore, subject to regulation (as is any exercise of public rights in the public trust) falls within the scope of the public trust.
To reiterate, the public trust doctrine serves to protect resources — here the waters of the Great Lakes and their submerged lands — shared in common by the public. See pp 678-679 of this opinion; see also Venice of America Land Co, supra at 702 (noting that “the State of Michigan holds these lands in trust for the use and benefit of its people”). As trustee, the state must preserve and protect specific public rights below the ordinary high water mark and may permit only those private uses that do not interfere with these traditional notions of the public trust. See Obrecht v Nat’l Gypsum Co, 361 Mich 399, 412-413; 105 NW2d 143 (1960). Yet its status as trustee does not permit the state, through any of its branches of government, to secure to itself property rights held by littoral owners. See Hilt, supra at 224 (“The state must be honest.”).[24]
*695 We first note that neither party contests that walking falls within public rights traditionally protected under our public trust doctrine. Rather, they dispute where, not whether, plaintiff may walk: below the literal water’s edge or below the ordinary high water mark. While the parties’ agreement on this point cannot determine the scope of public rights, this agreement does indicate the existence of a common sense assumption: walking along the lakeshore is inherent in the exercise of traditionally protected public rights.
Our courts have traditionally articulated rights protected by the public trust doctrine as fishing, hunting, and navigation for commerce or pleasure. See Nedtweg, supra at 16; Venice of America Land Co, supra at 702; Lake St Clair Fishing & Shooting Club, supra at 586; Lincoln, supra at 388.[25]
In order to engage in these activities specifically protected by the public trust doctrine, the public must have a right of passage over land below the ordinary high water mark. Indeed, other courts have recognized a “right of passage” as protected with their public trust. See Town of Orange v Resnick, 94 Conn 573, 578; 109 A 864 (1920) (listing as public rights “fishing, boating, hunting, bathing, taking shellfish, gathering seaweed, cutting sedge and . . . passing and repassing”); Arnold v *696 Mundy, 6 NJL 1, 12 (1821) (reserving to the public the use of waters for “purposes of passing and repassing, navigation, fishing, fowling, [and] sustenance”).
We can protect traditional public rights under our public trust doctrine only by simultaneously safeguarding activities inherent in the exercise of those rights. See, e.g., Attorney General, ex rel Director of Conservation v Taggart, 306 Mich 432, 435, 443; 11 NW2d 193 (1943) (permitting wading in a stream pursuant to the public trust doctrine). Walking the lakeshore below the ordinary high water mark is just such an activity, because gaining access to the Great Lakes to hunt, fish, or boat required walking to reach the water.[26] Consequently, the public has always held a right of passage in and along the lakes.
Even before our state joined the Union, the Northwest Ordinance of 1787, art iy protected our Great Lakes in trust: “The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free . . . .” See Northwest Ordinance of 1787, art IV Given that we must protect the Great Lakes as “common highways,” see id., we acknowledge that our public trust doctrine permits pedestrian use-in and of itself-of our Great Lakes, up to and including the land below the ordinary high water mark.
Yet in Hilt, supra at 226, our Court noted the rule stated by the Wisconsin Supreme Court in Doemel v Jantz, 180 Wis 225; 193 NW 393 (1923): “[T]he public has no right of passage over dry land between low and high-water mark but the exclusive use is in the riparian owner . . . .” When read in context, this quotation does *697 not represent a rejection of walking as impermissible within our public trust. As correctly described by Justice MARKMAN, the Hilt Court cited this passage as part of its discussion regarding the Michigan Supreme Court’s correction of an earlier departure from the common law.[27] See post at 745-747. But rather than adopting that rule from Doemel, the Hilt Court listed this rule, among others, to refute the notion that the state held “substantially absolute title” in the lakes and the lands beneath them. Hilt, supra at 224. Instead, “the State has title in its sovereign capacity,” id., pursuant to the public trust doctrine. Consequently, “the right of the State to use the bed of the lake, except for the trust purposes, is subordinate to that of the riparian owner.” Id. at 226, citing Town of Orange, supra at 578. In light of this exception for the public trust, littoral owners’ rights supersede public rights in the same property (by virtue of their ownership) only to the extent that littoral owners’ rights do not contravene the public trust. See id. When the Hilt Court recognized the greater rights of littoral property owners, it did not alter the public trust or preclude the public from walking within it.
We must conclude with two caveats. By no means does our public trust doctrine permit every use of the trust lands and waters. Rather, this doctrine protects only limited public rights, and it does not create an unlimited public right to access private land below the ordinary high water mark. See Ryan v Brown, 18 Mich 196, 209 (1869). The public trust doctrine cannot serve *698 to justify trespass on private property. Finally, any exercise of these traditional public rights remains subject to criminal or civil regulation by the Legislature.
TV RESPONSE TO OUR COLLEAGUES
Our Court unanimously agrees that defendants cannot prevent plaintiff from walking along the shore of Lake Huron within the area of the public trust. Despite the separate theory that undergirds the analysis, Justices MARKMAN and Young agree with the majority that plaintiff may walk along Lake Huron in the area of the public trust.
Moreover, the majority and our colleagues agree on several other points. We agree that the public trust doctrine, descended at common law, applies to our Great Lakes. See Hilt, supra at 202 (“[T]his Court has consistently held that the State has title in fee in trust for the public to submerged beds of the Great Lakes within its boundaries.”). We further agree that the public trust doctrine requires the state as trustee to preserve public rights in the lakes and lands submerged beneath them. See Nedtweg, supra at 16. Finally, we agree that plaintiff retains the same right to walk along the Great Lakes she has always held. Post at 745. That our colleagues disagree with the other members of this Court over the particulars of how far those public rights extend ought not overshadow our fundamental agreement: plaintiff does not interfere with defendants’ property rights when she walks within the public trust.
Despite the sound and fury of Justice MARKMAN’s concurring and dissenting opinion,[28] we do not radically *699 depart from our precedents or destabilize property rights by upholding and applying our common law. While our colleagues in dissent claim to maintain the status quo, they do not do so. Rather, the majority retains and clarifies the status quo. The trial court correctly permitted plaintiff to walk lakeward of the ordinary high water mark. The Court of Appeals also correctly recognized the importance of the public trust doctrine, though we reverse its requirement that plaintiff walk only where water currently lies.
Yet our colleagues in dissent would repeat this error by continuing to grant an exclusive right of possession to littoral landowners. Indeed, they would compound this error by granting littoral landowners all property down to where unsubmerged land ends, which they locate at the water’s edge,[29] regardless of the terms of *700 landowners’ deeds.[30] We would not so casually set aside the countless deeds that order property rights for the length of our state shoreline. We would not give away to littoral landowners the absolute title to public trust land preserved for the people. Such a departure would represent a grave disturbance to the property rights of littoral landowners and of the public.
Notwithstanding Justice Maekman’s characterization of this case as “aberrational,’’post at 711,712, and 755, we have not invented the dispute presented to us. Nor do we have the luxury of forsaking public rights; our Court is one of the “sworn guardians of Michigan’s duty and responsibility as trustee of the [Great Lakes].” See Obrecht, supra at 412. For the reasons described earlier in the opinion, we conclude that public rights may overlap with private title. Consequently, we refuse to enshrine-for the first time in our history-a solitary boundary between them. In this way, we preserve littoral title as landowners have always held it, and we preserve public rights always held by the state as trustee.
In dissent, our colleagues resist acknowledging the boundary of the public trust as the ordinary high water mark. To reach this conclusion, Justice MAEKMAN relies on cases concerning the boundary ofprivate title, rather than the boundary of the public trust. See, e.g., Silber *701 wood; Lake St Clair Hunting & Fishing; Hilt.[31] He refuses to accept our Court’s holding-in a case involving Lake Michigan-that “ ‘the limit of the public’s right is the ordinary high water mark Peterman, supra at 198 (citation omitted).[32] Although he criticizes the majority for vagueness with regard to the definition of that term,[33] we clarify the meaning of that term in a *702 way that allows for the fact-specific inquiry necessary to account for the range of physical forces and variety of landforms along our shoreline.[34] We decline to draw, merely for a charade of clarity, a universal line along the Great Lakes without any factual development of the point in the instant case or legal argument on an issue of significance to our state’s jurisprudence.
Nor does our colleagues’ “water’s edge” concept provide superior clarity. Although the term might intuitively appear to mean where the water meets land, Justice MARKMAN expands the term to include sand dampened by water. See, e.g., post at 744 (“Because by definition such sands are infused with water, the wet sands fall within the definition of ‘submerged lands.’ ”). Our colleagues’ conception of “water’s edge” neglects to account for (1) geography where sand is absent; (2) sudden changes in water levels such as storm surges; (3) what degree of dampness suffices: that identified by touch, sight, or a scientific review that could identify the presence of a single water molecule; and (4) the source of the water, where dampness may arise because of contact with a liquid, such as rain, other than water from the Great Lakes. Also, the instant-by-instant determination of a property boundary affords little certainty to littoral landowners. Given these serious difficulties in applying our colleagues’ “water’s edge” rule and the absence of support in our case law, we refuse to shift the boundary on the public trust away from the ordinary high water mark.
*703 As trustee, the state has an obligation to protect the public trust. The state cannot take what it already owns. Because private littoral title remains subject to the public trust, no taking occurs when the state protects and retains that which it could not alienate: public rights held pursuant to the public trust doctrine.[35] Certainly, the loss of littoral property or riparian rights could result from an unconstitutional taking. See, e.g., Peterman, supra at 198, 208 (compensating the plaintiffs for losses above the ordinary high water mark); see also Bott v Natural Resources Comm, 415 Mich 45, 80; 327 NW2d 838 (1982); Hilt, supra at 225. Yet, here, defendants have not lost any property rights. Rather, they retain their property subject to the public trust, just as all property that abuts the Great Lakes in Michigan remains subject to the public trust, pursuant to our common law.
Justice MARKMAN also criticizes the majority for leaving unanswered many questions, several of which require the adoption of the legal framework that he proposed. Yet this case raises none of the questions that Justice MARKMAN poses. In general, we reserve the judgment of this Court for “actual cases and controversies” and do not “declare principles or rules of law that have no practical legal effect in the case before us ....” Federated Publications, Inc v City of Lansing, 467 Mich 98, 112; 649 NW2d 383 (2002). Accordingly, we decline to rule on issues that are not before us.
*704 v CONCLUSION
We conclude that plaintiff, as a member of the public, may walk the shores of the Great Lakes below the ordinary high water mark. Under longstanding common-law principles, defendants hold private title to their littoral property according to the terms of their deed and subject to the public trust. We therefore reverse the judgment of the Court of Appeals and remand this case to the trial court for further proceedings consistent with this opinion.
Taylor, C.J., and Cavanagh, Weaver, and Kelly, JJ., concurred with CORRIGAN, J.

 Modern usage distinguishes between “littoral” and “riparian,” with the former applying to seas and their coasts and the latter applying to rivers and streams. Black’s Law Dictionary (7th ed). Our case law has not always precisely distinguished between the two terms. Consistent with our recognition that the common law of the sea applies to our Great Lakes, see People v Silberwood, 110 Mich 103, 108; 67 NW 1087 (1896), citing Illinois Central R Co v Illinois, 146 US 387, 437; 13 S Ct 110; 36 L Ed 1018 (1892), we will describe defendants’ property as littoral property. Although we have attempted to retain consistency in terminology throughout our discussion, we will at times employ the term “riparian” when the facts or the language previously employed so dictate. For example, a littoral owner of property on the Great Lakes holds riparian. rights as a consequence of owning waterfront property. See Hilt v Weber, 252 Mich 198, 225; 233 NW 159 (1930).

 We note that, in the view of our colleagues, “submerged land” includes not only land that lies beneath visible water, but wet sands that are “infused with water.” See post at 744.

 The Great Lakes Submerged Lands Act, formerly MCL 322.701 et seq., is now part of Michigan’s Natural Resources and Environmental Protection Act, MCL 324.101 et seq.

 We refer to a similarly situated sister state not for the entirety of its public trust doctrine, but for a credible definition of a term long employed in our jurisprudence. Despite Justice Markman’s protestation over upsetting settled rules, see, e.g., post at 735, we have recourse to this persuasive definition because, as noted by Justice Young, this area of law has been characterized by critical terms receiving less than precise definition. See post at 704.

 We note that the parties do not contest the terms of the deed hy which defendants own their property. We take as given that defendants hold title to their property according to the terms of their deed. The record does not reflect any argument over the meaning of the term “meander line” in this context. The issue before us is not how far defendants’ private littoral title extends, but how the public trust affects that title.

 In this decision, we consider the public trust doctrine only as it has applied to the Great Lakes and do not consider how it has applied to inland bodies of water.

 Although not implicated in this case, we note that the Great Lakes and the lands beneath them remain subject to the federal navigational servitude. This servitude preserves for the federal government control of all navigable waters “for the purpose of regulating and improving navigation ... .” Gibson v United States, 166 US 269, 271-272; 17 S Ct 578; 41 L Ed 996 (1897). “[A]lthough the title to the shore and submerged soil is in the various States and individual owners under them, it is *679 always subject to the servitude in respect of navigation created in favor of the Federal government by the Constitution.” Id. at 272. Apart from this servitude, the federal government has relinquished to the state any remaining ownership rights in the Great Lakes. See 43 USC 1311.

 Indeed, other states also recognize the distinction between private title and public rights. See, e.g., State v Longshore, 141 Wash 2d 414, 427; 5 P3d 1256 (2000) (“The state’s ownership of tidelands and shorelands is comprised of two distinct aspects — the jus privatum and the jus publicum.”)-, Smith v State, 153 AD2d 737, 739-740; 545 NYS2d 203 (1989) (“This doctrine grows out of the common-law concept of the jus publicum, the public right of navigation and fishery which supersedes a private right ofjus privatum.”) (citations omitted); Bell v Town of Wells, 557 A2d 168, 172-173 (Me, 1989) (stating that the different types of title in the same shore property “remain in force” to this day); see also R W Docks & Slips v State, 244 Wis 2d 497, 509-510; 628 NW2d 781 (2001) (applying the public trust doctrine as adopted in its state constitution).

 See Black’s Law Dictionary (7th ed), defining “jus publicum” as “[t]he right, title, or dominion of public ownership; esp., the government’s right to own real property in trust for the public benefit.”

 See id.., defining “jus privatum” as “[t]he right, title, or dominion of private ownership.”

 A land patent is “[a]n instrument by which the government conveys a grant of public land to a private person.” Black’s Law Dictionary (7th ed), p 1147.

 Section 32503 provides that the Department of Environmental Quality (DEQ) may enter into agreements regarding land use or alienate unpatented land to the extent that doing so will not impair “the public trust in the waters .. ..” MCL 324.32503. Section 32504 governs applications for deeds or leases to unpatented lands. MCL 324.32504. Section 32504a concerns the restoration and maintenance of lighthouses. MCL 324.32504a. Section 32505 covers unpatented lake bottomlands and unpatented made lands, again providing that such lands may be conveyed as long as the public trust “will not be impaired or substantially injured.” MCL 324.32505. Sections 32506 through 32509 concern the valuation of *684 unpatented lands and various administrative matters (with § 32509 delegating authority to promulgate rules to the DEQ). MCL 324.32506 through 324.32509. Section 32510 establishes that a violation of the act is a misdemeanor punishable by imprisonment or a fine. MCL 324.32510. Prohibited acts are defined in § 32512, MCL 324.32512, with § 32512a, MCL 324.32512a, specifically focusing on the removal of vegetation. Sections 32513 and 32514 return to administrative matters, such as applications for permits and public notice of hearing. MCL 324.32513 and 324.32514. Section 32515, MCL 324.32515, deals with enlargement of waterways, and § 32516, MCL 324.32516, returns again to the removal of vegetation.

 MCL 324.32502.

 The Legislature has recognized the public trust in other contexts as well. As early as 1913, the Legislature had made provision for the disposition and preservation of the public trust by entrusting trust lands and waters to the care of the predecessor of the DEQ. See 1913 PA 326, 1915 CL 606 et seq.; see also Nedtweg, supra at 18, 20 (upholding the constitutionality of the act because any authorized uses would yield to the “rights of the public”). In addition, the Legislature has conveyed small fractions of the lakes and shoreline to private parties, though only after ensuring that such conveyances did not disturb the public trust. See, e.g., 1954 PA 41; 1959 PA 31; 1959 PA 84.

 This decision relied not simply on a “navigational servitude” unique to that case, but rooted that “navigational servitude” in the public trust doctrine. See id. at 194 n 22, citing Collins, supra at 45-46; Venice of America Land Co, supra; Nedtweg, supra at 16-17.

 See La Porte v Menacon, 220 Mich 684; 190 NW 655 (1922) (resolving a dispute between private landowners over a deed term and bounding property at the low water mark); Lake St Clair Fishing & Shooting Club, supra at 587, 594-595 (setting the boundary of private title at the low *688 water mark, while simultaneously endorsing Shively and Illinois Central I and ID; Silberwood, supra at 107 (reciting the holdings of other jurisdictions that a riparian owner’s fee ends at the low water mark); Lincoln, supra at 384 (considering the boundaries of a grant made by the federal government, rather than the boundary on what the government retained). In Collins, supra at 60 (Fellows, J., concurring), our Court differed and used the high water mark as the boundary to private title, but that case involved property on an inland stream.
In People v Warner, 116 Mich 228, 239; 74 NW 705 (1898), the Court appeared to place a single boundary between the riparian owner’s title and state control, stating that “[t]he adjoining proprietor’s fee stops [at the high or low water mark], and there that of the State begins.” Yet this boundary marks “the limit of private ownership.” Id. This recalls the fact that the state might hold proprietary title or, separate from that title, title as trustee to preserve the waters and lands beneath them on behalf of the public. The Court proceeded to distinguish the state’s interest in the waters from the interest of the public in navigation, fish, and fowl. Id. Thus, in context, the Warner Court recognized a boundary on a riparian title, a title that remained subject to the public trust. But the Court did not equate that boundary with the limit of the public trust.

 Although in the context of an inland stream case, Justice Fellows noted the possibility of different boundaries on the public trust and riparian ownership in his concurring opinion in Collins, supra at 52, quoting Bickel v Polk, 5 Del 325, 326 (Del Super, 1851):
“The right of fishing in all public streams where the tide ebbs and flows, is a common right, and the owner of land adjoining tide water, though his title runs to low water mark, has not an exclusive right of fishing; the public have the right to take fish below high water mark, though upon soil belonging to the individual, and would not be trespassers in so doing; but if they take the fish above high water mark, or carry them above high water mark and land them on private property, this would be a trespass .... In all navigable rivers, where the tide ebbs and flows, the people have of common right the privilege of fishing, and of navigation, between high and low water mark; though it be over private soil.”

 Moreover, the particular issue in Hilt was the boundary of private title on relicted!accreted land, which is not at issue in the present case.

 The Hilt Court concluded by stating how the public trust doctrine affected a riparian owner’s private title:
While the upland owner, in a general way, has full and exclusive use of the relicted land, his enjoyment of its use, especially his freedom to develop and sell it, is clouded by the lack of fee title, the necessity of resorting to equity or to action for damages instead of ejectment to expel a squatter, and the overhanging threat of the State’s claim of right to occupy it for State purposes. The State, except for the paramount trust purposes, could make no use of the land .... [Id. at 227.]

 While an average member of the public may not require this degree of precision, Trudeau illustrates how a factual dispute over the location of the ordinary high water mark may be resolved. In that case, the parties presented evidence via expert witnesses. Id. at 108. For example, the state’s expert testified that he “analyzed several aerial photographs . . . , the government survey maps, the site’s present configuration, and stereo [three-dimensional] photographs . ...” Id. Numerous resources exist to provide guidance to professionals. See, e.g., Simpson, River & Lake Boundaries: Surveying Water Boundaries — A Manual (Kingman, AZ: Plat Key Publishing, 1994); Cole, Water Boundaries (New York: J Wiley & Sons, 1997). Not surprisingly, this Court requires a survey based on proper monuments to establish an actual property line. Hurd v Hines, 346 Mich 70, 78-for a boundary set by one of our Great Lakes.

 Enacted after the GLSLA employed a standard based on International Great Lakes Datum for the Great Lakes, MCL 324.30101(i), which contains definitions previously found in the former Inland Lakes and Streams Act, in relevant part provides:
“Ordinary-high water mark” means the line between upland and bottomland that persists through successive changes in water levels, below which the presence and action of the water is so common or recurrent that the character of the land is marked distinctly from the upland and is apparent in the soil itself, the configuration of the surface of the soil, and the vegetation.

 33 CFR 328.3(e) provides:
The term ordinary high water mark means that line on the shore established by the fluctuations of water and indicated by physical characteristics such as clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

 As our Court has consistently recognized, water boundaries necessarily defy static definition. See Hilt, supra at 219. For example, the common law recognized riparian rights to accretion and reliction. This meant that riparian landowners gained private title to land adjacent to their property that gradually became permanently exposed through erosion or a change in water level. See Peterman, supra at 192-193. The recognition of these riparian rights shows that our courts have refused to fix a line that defies natural processes. Also, the concept of a “moveable freehold” to accommodate the effects of accretion and reliction on the bounds of littoral title shows our acknowledgement of the shifting nature of water boundaries. See id., Klais v Danowski, 373 Mich 262, 275-276; 129 NW2d 414 (1964), and Broedell, supra at 206, all quoting Hilt, supra at 219.

 For example, in Hilt, supra at 225, we noted several riparian rights held by landowners whose property abuts water. These riparian rights include the “[u]se of the water for general purposes, as bathing, domestic *695 use, etc. [,]... wharfling] out to navigability [,]... [a]ccess to navigable waters [, and]... [t]he right to accretions.” (Citations omitted.) Moreover, “[r]iparian rights are property, for the taking or destruction of which by the State compensation must be made, unless the use has a real and substantial relation to a paramount trust purpose.” Id.-, see also Peterman, supra at 191. Thus, we have long recognized the value of riparian rights, but those rights remain ever subject to the “paramount” public trust.

 Indeed, we have even noted that the public might cut ice or, in the context of inland waters, might float logs downriver. See Lake St Clair Fishing & Shooting Club, supra at 587; Grand Rapids Booming Co v Jarvis, 30 Mich 308, 319 (1874).

 This does not imply a right of lateral access in the public, i.e., a right to traverse the land of littoral owners to reach the lands and waters held in trust. See, e.g., Collins, supra at 49.

 The Kavanaugh cases departed from the common law by fixing the meander fine as the boundary on private littoral title and by fixing the legal status of land below that fine, regardless of subsequent physical changes. See Hilt, supra at 213; see also Kavanaugh v Rabior, 222 Mich 68; 192 NW 623 (1923); Kavanaugh v Baird, 241 Mich 240; 217 NW 2 (1928).

 For example, Justice Markman predicts the appearance of fences along the shore. Yet to the extent that landowners may do as they see fit *699 on their own property, they could always erect a fence. While we share Justice Maekman’s desire to preserve any “long coexistfence] in reasonable harmony,” post at 710 n 2, we find peculiar his implication that resolving an actual instance of disharmony between these parties or correcting the lower court’s departure from our common law equates with this Court’s endorsement of (or even comment on) property owners using fences. Were we to adopt our colleagues’ approach, littoral landowners could place fences as far down as the water’s edge.

 Numerous states bound their public trust, not at an instantaneously defined “water’s edge,” but at their high water mark. See, e.g., Barboro v Boyle, 119 Ark 377, 385; 178 SW 378 (1915) (high water mark for a lake); Simons v French, 25 Conn 346, 352-353 (1856) (high water mark on tidal waters); Day v Day, 22 Md 530, 537 (1865) (high water mark on tidally influenced rivers and streams); State v Florida Natural Properties, Inc, 338 So 2d 13, 19 (Fla, 1976) (ordinary high water mark); Freeland v Pennsylvania R Co, 197 Pa 529, 539; 47 A 745 (1901) (ordinary high water mark); Allen v Allen, 19 RI 114, 115; 32 A 166 (1895) (high water mark); State v Hardee, 259 SC 535, 541-542; 193 SE2d 497 (1972) (high water mark on tidally influenced stream).
Indeed, references in other states to “water’s edge” often tie that term to either a high or low water mark. See, e.g., Concord Mfg Co v Robertson, 66 NH 1, 19-21; 25 A 718 (1889); Lamprey v State, 52 Minn 181, 198; 53 *700 NW 1139 (1893); Hazen v Perkins, 92 Vt 414, 419-421; 105 A 249 (1918); Mont Code, § 70-16-201; ND Cent Code, § 47-01-15.

 In the absence of a review of the myriad deeds by which landowners hold title to property on the Great Lakes, Justice Markman assumes that their deeds will describe, in some manner, the “water’s edge.” Yet, as he acknowledges, that water’s edge may shift. This could result in water reaching above the low water mark, even though a deed could convey title to the low water mark. See, e.g., La Porte v Menacon, 220 Mich 684, 687; 190 NW 655 (1922) (enforcing a deed that extended private title to the “shore,” meaning the “water’s edge at its lowest mark”).

 Justice Markman makes frequent reference to colonial cases, particularly relying on Massachusetts. But as that state’s high court has made clear, at common law the state owned to the mean high water line subject to public rights in navigation and fishing. See Opinion of the Justices to the House of Representatives, 365 Mass 681, 684-685; 313 NE2d 561 (1974). What the court described as the colonial ordinance of 1641 to 1647 changed the common law to allow private title to the low water mark, but even that extended title remained subject to public rights. Id. Unlike Massachusetts, no colonial ordinance altered the common-law concepts in Michigan.

 In seeming contradiction to his reading of Peterman, Justice Mark-man does accept that “the ‘ordinary high water mark’ is simply the outside edge of property that may... be regulated to preserve future navigational interests at times of high water ....” Post at 729. He also goes so far as to suggest that our Court has equated the high and low water marks, see post at 748, but the Warner Court on which he relies did not address that issue. Warner, supra at 239 (“If the absence of tides upon the Lakes, or their trifling effect if they can be said to exist, practically makes high and low water mark identical for the purpose of determining boundaries (a point we do not pass upon), the limit of private ownership is thereby marked.”).
Additionally, our precedent stands in contradiction to Justice Young’s intuition that the ordinary high water mark has no application in Michigan. See, e.g., Peterman, supra at 198-199 (calculating damages, at least in part, on the basis of the location of the ordinary high water mark). In contrast, the “wet sand” standard supported by Justice Young appears for the first time in our state in this case. We have serious reservations about adopting the view that he joins Justice Markman in advancing. See post at 744-745.

 In apparent tension with his claim that the majority fails to rely on Michigan common law, Justice Markman purports to offer an authoritative definition for ordinary high water mark that derives from a federal case and a 1997 dictionary. See post at 738-739.

 We are unpersuaded that Justice Markman’s recitation of natural forces demonstrates a difficulty in ascertaining the ordinary high water mark, because those same forces operate to shift the “water’s edge.” See post at 740-743. If anything, the results of this scientific expedition show the complexity of arriving at a water-tight definition, rather than prove that the “water’s edge” concept escapes similar difficulties.

 The United States Supreme Court has held that the issue before us is a matter of state property law. See Phillips Petroleum Co v Mississippi, 484 US 469, 475; 108 S Ct 791; 98 L Ed 2d 877 (1988) (“[T]he individual States have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit.”); see also Shively, supra at 40 (“[T]he title and rights of riparian or littoral proprietors in the soil below high water mark of navigable waters are governed by the local laws of the several States, subject, of course, to the rights granted to the United States by the Constitution.”).