## PORTER *v.* SELLECK.

1. QUIETING TITLE — BOUNDARIES — ARTIFICIAL ISLAND — FINDING
NOT DISTURBED ON APPEAL.

On appeal from the decree in favor of plaintiff, in a suit
to quiet title to land, the finding of the court below that
a cut across the neck of a peninsula, creating an island
not shown on the plat of the original governmental sur-
vey, is artificial, and not natural, is not disturbed.[1]

2. BOUNDARIES—WATERS AND WATERCOURSES—MEANDER LINE NOT
TRUE BOUNDARY.

The meander line is not a boundary, but the body of
water whose margin is meandered is the true boundary.[2]

3. SAME—PENINSULA SHOWN IN SURVEY BOUNDED BY WATER IN-
CLUDED IN GRANT ALTHOUGH CUT OFF BY MEANDER LINE.

A grant of land from the government included a penin-
sula projecting northeasterly into a lake, where the survey
showed that it was bounded on the north and east by the
waters of the lake, although the greater part of the pen-
insula was treated by the survey as water and was cut
off by the meander line.[3]

4. PUBLIC LANDS—GRANT FROM GOVERNMENT NOT SUBJECT TO AT-
TACK ON GROUND OF MISTAKE IN SURVEY.

A grant of land from the government may not be at-
tacked on the ground that the survey may have been
mistaken or wrong, where the government has never
brought suit for its cancellation on the ground of fraud,
mistake, or error.[4]

5. SAME—SECOND GRANT OF LAND BY GOVERNMENT NOT PREJUDICIAL
TO OWNER UNDER PREVIOUS GRANT—JURISDICTION LACKING.

The owner of land under government grant suffers no
prejudice by a subsequent survey and grant of part of
the same land by the executive department of the govern-
ment, since it has no jurisdiction over it; the question

---

[1]Quieting Title, 32 Cyc. p. 1372; [2]Boundaries, 9 C. J. § 69;
[3]Id., 9 C. J. § 69; [4]Public Lands, 32 Cyc. pp. 802, 1040.

as to whether said land was previously disposed of being a judicial one.[5]

Appeal from Missaukee; Lamb (Fred S.), J.    Submitted June 11, 1926.    (Docket No. 98.)    Decided December 8, 1926.

Bill by Glenn M. Porter, trustee, against William H. Selleck to quiet title to land.    From a decree for plaintiff, defendant appeals.    Affirmed.

*Penny & Worcester,* for plaintiff.

*Henry Miltner,* for defendant.

CLARK, J.    The Grand Rapids & Indiana Railroad Company, a railroad corporation, in 1864, by virtue of an act of congress granting certain public lands in aid of the construction of certain railroads, obtained grant of government lot 13, in section 35, T. 23 N., R. 8 W., Missaukee county, recorded April 22, 1901. Through mesne conveyances from the grantee the premises are now owned by the plaintiff.

In 1838 the township itself was surveyed by the government, and the subdivision thereof in 1852, and the plat of the original survey was filed with the general land office.    Meander lines were run around Goose lake, a fresh water pond or lake having an area of 133 acres.    Lot 13 is bounded on the north and east by the lake.    The following part of the plat of the township (p. 657) will show the lake as meandered and the lot.

The other lots about the lake were conveyed in 1871.    It will be observed from the map that as meandered lot 13 included a tongue or peninsula of land projecting into the lake in a northeasterly direction, the map and survey show no land or islands beyond, nothing to indicate any reservation by the

─────────────────────

[5]Public Lands, 32 Cyc. pp. 1008, 1028.

government. The fact is that the meander line was carried across the peninsula, and that the plat shows but a small part of it. The following map (p. 658) shows the situation in fact.

This map shows a cut across the peninsula. The meander line follows it. The trial judge found as a

fact that the cut was artificial, not natural.    We do not disturb the finding.    The cut is 36 rods north of the base of the peninsula, about 2 feet deep, about 2 to 6 feet wide at bottom and about 10 to 14 feet at top.    Whether it contains water and how much depend on the varying level of the lake.    The peninsula is land in its entirety, high land, averaging about 12 feet above the lake level, at one point nearly 30 feet.    Lot 13 within its boundaries according to the

plat contains 39 acres.    The portion of the peninsula north of and beyond the meander line contains about 15 acres.

Prior to 1888 one Hemphill made application to the general land office to have the land north of the cut surveyed as an island.    On February 27, 1888, the application was disallowed, we quote:

"The facts appear to be that the land in question is the end of a peninsula extending into the lake and existing, undoubtedly, at the time of the original survey in substantially its present condition, except as its surface may have been altered by the hand of man. The plat of the survey does not show any island; according to the plat, the south and west boundary lines of the fractional lot (lot 13) were surveyed lines, and north and east lines the waters of the lake.    The meander line, by which, on the plat, the east and north sides of the fractional lot were roughly indicated, appears not to have accurately followed the course of the shore, but to have passed across the neck of the peninsula so as not to have included in the computation of the contents of the fractional lot all of the land upon the peninsula.    It would appear that if the meander line were to be traced upon the land it would leave outside of it the projecting end of the peninsula, which is now called an island by the applicant for the survey.    *    *    *

"When, therefore, a patent was given of fractional lot 13, reference for its boundaries was impliedly made to the official plat and the statutes, and these showed the natural landmark of the water on the north and east sides as the limits of the lot.    This natural landmark is not to be disregarded because the meander line was inaccurate.    The mistake of the surveyor, even though it were willfully or recklessly made, in failing to accurately trace the natural landmark and to embrace all the true contents of the lot in the computation of its area, is not a mistake which altered the surveyed boundaries.    Its effect was, it is true, to deprive the government of the full price which might have been demanded for the land by diminishing the acreage, reported below the true quantity.    This is an effect often resulting from inaccurate meander

lines in the surveys, but it cannot be allowed that the purchaser from the United States according to the plat, much less those who have taken title through mesne conveyances, shall be deprived of the area which the boundaries of the lot as shown by the plat entitle them to have.    The rule is familiar that courses, distances and quantities, as points of identification of a grant must yield to the natural or fixed landmarks upon the grant (*Shufeldt* v. *Spaulding*, 37 Wis. 662).

"Upon the facts as presented, therefore, the lands sought to be surveyed cannot be regarded as part of the public remaining unsurveyed, and the application for survey is denied.

"Very respectfully,

"S. M. STOCKSLAGER,

"Acting Commissioner."

In November, 1908, James Boyer made another like application.    A survey, August 18, 1909, was made, entitled "Survey of Goose Island," etc.    Upon the filing of the survey Boyer made application under section 2289, Revised Statutes of the United States, to enter lots 11 and 15 purporting to comprise, as so surveyed, Goose Island.    A protest was filed by one Thorpe then the owner of lot 13.    But on April 24, 1914, a patent was issued to Boyer of the land in the peninsula, north of the cut, as government lots 11 and 15.    Patent was recorded on January 7, 1915. Defendant is grantee of Boyer and wife.    The bill was filed to quiet title of plaintiff in and to the peninsula.    Plaintiff had decree.    Defendant has appealed.

1. Did title to the peninsula pass with the original conveyance of government lot 13?    We think it did. The meander line cut off most of the peninsula leaving it outside the meander.    The survey treated it as water, nonexistent as land, but as a part of the lake. By the survey lot 13 is bounded on at least two sides by the lake, not by the meander.    In *Mitchell* v.

*Smale,* 140 U. S. 406 (11 Sup. Ct. 819, 840), it was said, citing cases:

"It has been decided again and again that the meander line is not a boundary, but that the body of water whose margin is meandered is the true boundary."

And we quote:

"It is the policy of the government not to assert title to such tracts, and to hold that the title passes to the abutting owners as though the land were included within the meander line." *Schmitz* v. *Klee,* 103 Wash. 9 (173 Pac. 1026) ; citing decisions of the United States Supreme Court.

In the *Mitchell Case,* plaintiff owned a parcel of land for which patent had been issued containing, according to the survey, nearly four acres, and on the plat of the survey it was shown as bordering on and bounded by the lake. But there, as here, the meander line had been carried across a peninsula extending from said parcel into the lake 220 rods, of varying width, about 28 rods, of varying elevation, covered with trees "three feet in diameter and under." After review of authorities, including *Hardin* v. *Jordan,* 140 U. S. 371 (11 Sup. Ct. 808, 838), it was held that the patent of the parcel passed title to the peninsula. To the case at bar *Schmitz* v. *Klee, supra,* is closely parallel in facts and in contentions of the parties, and there the *Mitchell Case* was followed. *Forsyth* v. *Smale,* 7 Bis. (U. S.) 201, presented a case of a tongue of land projecting beyond the meander line. The water and not the meander line was held to be the boundary. See, also, *Railroad Co.* v. *Schurmeir,* 7 *Wall.* (U. S.) 272; *Hardin* v. *Jordan, supra; Butler* v. *Railroad Co.,* 85 Mich. 246; *Grand Rapids, etc., R. Co.* v. *Butler,* 159 U. S. 87 (15 Sup. Ct. 991) ; *Sewers* v. *Hacklander,* 219 Mich. 143. And we quote again from the *Mitchell Case:*

"Our general views with regard to the effect of patents granted for lands around the margin of a nonnavigable lake, and shown by the plat referred to therein to bind on the lake, were expressed in the preceding case of *Hardin* v. *Jordan*, and need not be repeated here.    We think it a great hardship, and one not to be endured, for the government officers to make new surveys and grants of the beds of such lakes after selling and granting the lands bordering thereon, or represented so to be.    It is nothing more or less than taking from the first grantee a most valuable, and often *the* most valuable part of his grant.    Plenty of speculators will always be found, as such property increases in value, to enter it and deprive the proper owner of its enjoyment; and to place such persons in possession under a new survey and grant, and put the original grantee of the adjoining property to his action of ejectment and plenary proof of his own title, is a cause of vexatious litigation which ought not to be created or sanctioned.    The pretence for making such surveys, arising from the fact that strips and tongues of land are found to project into the water beyond the meander line run for the purpose of getting its general contour, and of measuring the quantity to be paid for, will always exist, since such irregular projections do always, or in most cases, exist."

And syllabus of *Doolan* v. *Carr*, 125 U. S. 618 (8 Sup. Ct. 1228) :

"Want of power in an officer of the land office to issue a land patent may be shown in an action at law by extrinsic evidence, although the patent may be issued with all the forms of law required for a patent of public land."

Cases in which the survey and plat indicate a reservation beyond the meander line by such words as "flag marsh" (*Niles* v. *Cedar Point Club*, 175 U. S. 300 [20 Sup. Ct. 124]), or "sunk lands" (*Chapman & Dewey Lumber Co.* v. *St. Francis Levee District*, 232 U. S. 186 [34 Sup. Ct. 297]), are, we think, clearly distinguishable.

2. Relative to the thought that the survey may have been mistaken or wrong, we quote from *Hardin* v. *Jordan, supra:*

"With the title passes away all authority or control of the executive department over the land, and over the title which it has conveyed.    It would be as reasonable to hold that any private owner of land who has conveyed it to another can, of his own volition, recall, cancel or annul the instrument which he has made and delivered.    If fraud, mistake, error or wrong has been done, the courts of justice present the only remedy.    These courts are as open to the United States to sue for the cancellation of the deed or reconveyance of the land as to individuals; and if the government is the party injured, this is the proper course."

3. Answering the suggestion that plaintiff suffers prejudice by the failure of his grantor to appeal from the unfavorable action toward his said protest, we quote again from *Hardin* v. *Jordan, supra:*

"If the lands patented were not at the time public property, having been previously disposed of, or no provision had been made for their sale or other disposition, or they had been reserved from sale, the department had no jurisdiction to transfer the lands, and their attempted conveyance by patent is inoperative and void.    So that, if the lands had been 'previously disposed of,' the department has no jurisdiction over them; and the question whether they have, or have not, been previously disposed of is a judicial question, and not determinable by the executive department, except for the purpose of governing its own conduct in the administration of its functions."

The lands having been, as we hold, previously disposed of, plaintiff suffers no prejudice by the decision and action of the department made and taken without jurisdiction.

4. The defense of adverse possession, urged in the trial court, is withdrawn in the brief.    That the relief prayed should be denied because of laches, the statute

of limitations, or because of a further claim of estoppel, are questions the discussion of which would be without profit.

The decree is affirmed, with costs to plaintiff.

BIRD, C. J., and SHARPE, SNOW, STEERE, FELLOWS, WIEST, and McDONALD, JJ., concurred.