BURLESON v DEPARTMENT OF ENVIRONMENTAL QUALITY

Docket No. 292916. Submitted December 10, 2010, at Lansing. Decided
    May 12, 2011, at 9:10 a.m. Leave to appeal denied, 490 Mich 917.
    Bobby Burleson sought review in the Ingham Circuit Court of a
    declaratory ruling by the Department of Environmental Quality
    (DEQ) (now the Department of Natural Resources and Environ-
    ment) regarding the extent of the DEQ's regulatory authority
    under the Great Lakes submerged lands act (GLSLA), MCL
    324.32501 *et seq.*, which is part 325 of the Natural Resources and
    Environmental Protection Act (NREPA), MCL 324.101 *et seq.*
    Burleson wished to construct a home on land bordering Lake
    Michigan and sought a permit under part 353 of NREPA, MCL
    324.35301 *et seq.*, which relates to sand dune protection. The DEQ
    refused to grant the permit, maintaining that Burleson was
    required to also obtain a permit under part 325. Burleson argued
    that no additional permit was necessary because the proposed
    building site was higher than the relevant elevation above sea level
    specified in MCL 324.32502, which petitioner maintained was the
    limit of the DEQ's jurisdiction over the land under part 325.
    Petitioner had requested a declaratory ruling from the DEQ
    related to this issue, and the DEQ concluded that its regulatory
    authority was not limited to the elevations identified in the statute
    as the ordinary high-water mark, but extended to the natural
    ordinary high-water mark or that point where the continuous
    presence and action of water on the land leaves a distinct mark.
    The court, Paula J. M. Manderfield, J., affirmed the DEQ's
    interpretation of the statute. Burleson appealed by leave granted.
        The Court of Appeals *held*:
        The limit of the DEQ's jurisdiction under the GLSLA is the
    natural ordinary high-water mark. MCL 324.32502 defines the
    ordinary high-water mark for each of the Great Lakes as an
    elevation above sea level according to the International Great
    Lakes Datum of 1955. The DEQ improperly interpreted the
    statute when it concluded that the Legislature intended the
    phrases "natural ordinary high-water mark" and the "ordinary
    high-water mark" to encompass different meanings, thereby pro-
    viding jurisdiction beyond the elevations identified in the statute.

Instead, the DEQ's regulatory authority under the statute was defined by the elevations listed in the statute, and the phrase "natural ordinary high-water mark" refers to the specified elevations identified in the statute as measured by the land in its natural state, unaltered by humans. Thus, the circuit court erred by affirming the DEQ's declaratory ruling.

Reversed and remanded.

GLEICHER, J., dissenting, stated that the phrases "natural ordinary high-water mark" and "ordinary high-water mark" have different meanings. The Legislature's purposeful inclusion of the word "natural" in MCL 324.32502 demonstrated that it did not intend to limit the DEQ's regulatory jurisdiction under the GLSLA to fixed elevations because the Great Lakes' shorelines are constantly changing. The GLSLA unambiguously directs that it should be interpreted in a manner that preserves and protects the Great Lakes. Accordingly, the circuit court's order upholding the DEQ's declaratory ruling should have been upheld.

WATERS AND WATERCOURSES — GREAT LAKES — BEACHES — REGULATORY AUTHORITY OF DEPARTMENT OF NATURAL RESOURCES AND ENVIRONMENT — NATURAL ORDINARY HIGH-WATER MARK.

The state's jurisdiction under the Great Lakes submerged lands act, MCL 324.32501 *et seq.*, extends to the ordinary high-water mark, that is, the elevation above sea level specified in MCL 324.32502 for each of the Great Lakes; the phrase "natural ordinary high-water mark" in the statute refers to the specified elevations as measured by the land in its natural state, unaltered by humans, and does not extend the jurisdiction of the Department of Natural Resources and Environment to land at a higher elevation.

*Warner Norcross & Judd, LLP* (by *Matthew T. Nelson*, *William C. Fulkerson*, and *Scott M. Watson*), for Bobby Burleson.

*Bill Schuette*, Attorney General, and *Louis B. Reinwasser*, Assistant Attorney General, for the Department of Environmental Equality.

Amici Curiae:

*McClelland & Anderson, L.L.P.* (by *Gregory L. McClelland* and *David E. Pierson*), for the Michigan Association of Realtors.

*McClelland & Anderson, L.L.P.* (by *Gregory L. Mc-Clelland* and *David E. Pierson*), for the Michigan Association Home Builders.

*Richard K. Norton* for the Michigan Association of Planning.

Before: MURPHY, C.J., and METER and GLEICHER, JJ.

METER, J. Petitioner appeals by leave granted from a circuit court order that affirmed respondent's declaratory ruling that its jurisdiction as set forth in MCL 324.32502, a provision of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq.*, extends to the natural ordinary high-water mark produced by the action of water against the shore. We agree with petitioner that respondent has misconstrued MCL 324.32502 and that respondent's jurisdiction extends instead to the specific elevations delineated in the statute. Accordingly, we reverse.

Petitioner wishes to construct a home on land that he owns on the shore of Lake Michigan at the Indiana border. According to his site plans, the house will be built at a minimum elevation of 585 feet above sea level, roughly 150 feet away from the water's edge. The property lies within a critical dune area, so petitioner applied to respondent, the Michigan Department of Environmental Quality (MDEQ),[1] for a permit under part 353 of NREPA, MCL 324.35301 *et seq.* Respondent refused to issue the permit, insisting that petitioner was also required to obtain a permit under part 325 of NREPA, also known as the Great Lakes submerged

---

[1] The MDEQ became part of the Michigan Department of Natural Resources and Environment on January 17, 2010. Executive Order No. 2009-45. For purposes of this case, however, the parties have continued referring to respondent as the MDEQ.

lands act (GLSLA), MCL 324.32501 *et seq*. Petitioner argues that MCL 324.32502 does not give respondent jurisdiction over the land on which he wishes to build.

The key statutory provision provides:

> The lands covered and affected by this part are all of the unpatented lake bottomlands and unpatented made lands in the Great Lakes, including the bays and harbors of the Great Lakes, belonging to the state or held in trust by it, including those lands that have been artificially filled in. The waters covered and affected by this part are all of the waters of the Great Lakes within the boundaries of the state. This part shall be construed so as to preserve and protect the interests of the general public in the lands and waters described in this section, to provide for the sale, lease, exchange, or other disposition of unpatented lands and the private or public use of waters over patented and unpatented lands, and to permit the filling in of patented submerged lands whenever it is determined by the department that the private or public use of those lands and waters will not substantially affect the public use of those lands and waters for hunting, fishing, swimming, pleasure boating, or navigation or that the public trust in the state will not be impaired by those agreements for use, sales, lease, or other disposition. *The word "land" or "lands" as used in this part refers to the aforesaid described unpatented lake bottomlands and unpatented made lands and patented lands in the Great Lakes and the bays and harbors of the great lakes lying below and lakeward of the natural ordinary high-water mark*, but this part does not affect property rights secured by virtue of a swamp land grant or rights acquired by accretions occurring through natural means or reliction. *For purposes of this part, the ordinary high-water mark shall be at the following elevations above sea level, international Great Lakes datum of 1955:* Lake Superior, 601.5 feet; *Lakes Michigan and Huron, 579.8 feet*; Lake St. Clair, 574.7 feet; and Lake Erie, 571.6 feet. [MCL 324.32502 (emphasis added).]

Petitioner requested a declaratory ruling from respondent to address the shoreline elevation along Lake

Michigan that constitutes the limit of respondent's juris-
diction for purposes of MCL 324.32502. Respondent's
declaratory ruling stated that its jurisdiction is based on
the natural ordinary high-water mark (NOHWM), which
is distinct from the ordinary high-water mark (OHWM).
The OHWM for Lake Michigan is statutorily set at
579.8 feet of elevation above sea level, but respondent,
citing *Glass v Goeckel*, 473 Mich 667, 693; 703 NW2d 58
(2005), ruled that the NOHWM is found at the point
where the "presence and action of the water is so
continuous as to leave a distinct mark either by erosion,
destruction of terrestrial vegetation, or other easily
recognized characteristic." Respondent ruled that the
NOHWM is coterminous with the public trust that
applies to littoral lands.[2]

Petitioner appealed in the Ingham Circuit Court,
arguing that the Legislature expressly limited respon-
dent's jurisdiction to lands lakeward of 579.8 feet in
elevation. The circuit court upheld the declaratory
ruling, finding respondent's interpretation of the stat-
ute more logical than petitioner's proposed interpreta-
tion. This appeal followed.

Statutory interpretation is a question of law that we
review de novo. *In re Complaint of Rovas Against SBC
Mich*, 482 Mich 90, 102; 754 NW2d 259 (2008). An
agency's interpretation is not binding on a court. *Id.* at
103. However, "the construction given to a statute by
those charged with the duty of executing it is always
entitled to the most respectful consideration and ought
not to be overruled without cogent reasons." *Id.* (quo-

---

[2] "Littoral" refers to land along a lake or seashore, while "riparian"
properly refers only to land along rivers. *Thies v Howland*, 424 Mich 282,
288 n 2; 380 NW2d 463 (1985). Historically, however, the term "riparian"
has often been used to refer to both types of land. *Id.*; see also *Glass*, 473
Mich at 672 n 1.

tation marks and citations omitted). Still, the agency's interpretation may not conflict with the intent of the Legislature as statutorily expressed, and "respectful consideration" does not mean "deference." *Id.* at 103, 108.

Respondent has jurisdiction to require permits under part 325 of the GLSLA concerning lands "lying below and lakeward of the natural ordinary high-water mark . . . ." MCL 324.32502. Because there is no provision defining the phrase "natural ordinary high-water mark," statutory interpretation is necessary. The main goal of statutory interpretation is to give effect to the intent of the Legislature. *Kuznar v Raksha Corp*, 481 Mich 169, 176; 750 NW2d 121 (2008). When statutory language is unambiguous, the Legislature is presumed to have intended the plain meaning of the statute. *Fleet Business Credit, LLC v Krapohl Ford Lincoln Mercury Co*, 274 Mich App 584, 591; 735 NW2d 644 (2007).

Unless defined in the statute, each word or phrase in a statute should be given its plain meaning. *Brackett v Focus Hope, Inc*, 482 Mich 269, 276; 753 NW2d 207 (2008). "A lay dictionary may be consulted to define a common word or phrase that lacks a unique legal meaning." *Id.* This Court should also presume that each statutory word or phrase has some meaning and thus avoid rendering any part of a statute nugatory. See *Robinson v City of Lansing*, 486 Mich 1, 21; 782 NW2d 171 (2010). The various parts of the statute must be read in the context of the whole statute to produce a harmonious whole. See, e.g., *Henry v Dow Chem Co*, 484 Mich 483, 495; 772 NW2d 301 (2009), and *Haliw v Sterling Hts*, 471 Mich 700, 706; 691 NW2d 753 (2005).

Again, the statute at issue states, in part:

This part shall be construed so as to preserve and protect the interests of the general public in the lands and

waters described in this section .... The word "land" or
"lands" as used in this part refers to the aforesaid described
unpatented lake bottomlands and unpatented made lands
and patented lands in the Great Lakes and the bays and
harbors of the great lakes lying below and lakeward of the
*natural ordinary high-water mark*, but this part does not
affect property rights secured by virtue of a swamp land grant
or rights acquired by accretions occurring through natural
means or reliction. For purposes of this part, the *ordinary
high-water mark* shall be at the following elevations above
sea level, international Great Lakes datum of 1955: Lake
Superior, 601.5 feet; Lakes Michigan and Huron, 579.8 feet;
Lake St. Clair, 574.7 feet; and Lake Erie, 571.6 feet. [MCL
324.32502 (emphasis added).]

The parties agree that the "natural ordinary high-
water mark" constitutes the limit of respondent's juris-
diction under part 325. However, they differ regarding
the proper interpretation of that phrase. In its declara-
tory ruling, respondent stated that the elevations speci-
fied in the last sentence of MCL 324.32502 are not used
to express the NOHWM, only the OHWM. Respondent
concluded that the NOHWM must be different from the
OHWM because otherwise the word "natural" would be
rendered superfluous. Respondent noted that the stat-
ute exempts from its jurisdiction lands formed by
reliction. The declaratory ruling explained that relic-
tion is the gradual recession of water in a sea, lake, or
stream, leaving permanently dry land. Thus, land that
has become permanently dry is not subject to respon-
dent's jurisdiction. Respondent argued that this idea is
incompatible with a rigid determination that its juris-
diction extends to a certain elevation.

Respondent's declaratory ruling went on to state
that the purpose of MCL 324.32502 was to protect the
rights contained in the public trust and, therefore, that
the NOHWM in the statute is the same as the "ordinary
high-water mark" discussed by the Supreme Court in

*Glass*. Respondent noted the language in the statute stating that it "shall be construed so as to preserve and protect the interests of the general public in the lands and waters described in this section" and to ensure that the "public trust in the state will not be impaired . . . ." MCL 324.32502. Respondent indicated that because the *Glass* Court held that the public trust is not limited by the elevations specified in MCL 324.32502, and because that statute is intended to preserve the public trust, respondent's jurisdiction should not be limited to the specified elevations, either.

We cannot agree with respondent's interpretation. A number of considerations lead us to conclude that the circuit court erred by affirming respondent's declaratory ruling. First, it strains credulity and common sense to conclude that phrases as similar as "natural ordinary high-water mark" and "ordinary high-water mark," employed within the same statutory paragraph, were intended by the Legislature to encompass the very different meanings that respondent sets forth.

Second, respondent's interpretation would pose serious difficulties concerning *why* the statutory elevations were included in MCL 324.32502 in the first instance. Respondent contends that the elevations are relevant for regulating activities such as dredging, beach maintenance, and the mowing and removal of vegetation. See MCL 324.32512, MCL 324.32501(b), MCL 324.32512a(3), MCL 324.32513(2)(b), and MCL 324.32516. However, most of these "uses" for the elevations were added many years after the elevations were codified. See 2003 PA 14 and 1968 PA 57 (amending former MCL 322.702 to add the elevations). Although one of the uses cited by respondent was in effect in 1968, before the 1968 amendment that added the elevations, the language containing the elevations was proposed in 1967. See former MCL 322.712

through 322.715, as added by 1968 PA 3, and HB 2621 of 1967 (enacted as 1968 PA 57). It again strains credulity to conclude that the Legislature included the elevations in the proposed statute for purposes that were not yet in existence.[3]

Third, had the Legislature meant to apply respondent's definition to the NOHWM, it could easily have added language explicitly doing so. Indeed, the Inland Lakes and Streams Act (ILASA), enacted two years before the amendments of the GLSLA that added the elevations were introduced, defined the phrase "ordinary high-water mark" in this manner. Former MCL 281.732(b), as added by 1965 PA 291; see MCL 324.30101(m).

Fourth, petitioner argues persuasively that the reference to reliction in the statute tends to negate respondent's interpretation. MCL 324.32502 states that "this part does not affect property rights secured by virtue of a swamp land grant or rights acquired by accretions occurring through natural means or reliction." If the NOHWM were independent of the listed elevations and defined in accordance with respondent's interpretation, then the "reliction exception" would be superfluous because relicted lands would, by definition, fall outside the boundary of the NOHWM as defined by respondent.

Fifth, that the *Glass* Court held that the public trust is not limited by the elevations in MCL 324.32502 does not give us license to apply respondent's definition to the NOHWM in the instant case. The *Glass* Court stated:

> Moreover, the [GLSLA] never purports to establish the boundaries of the public trust. Rather, the GLSLA estab-

---

[3] The dissent reasons that the phrase "ordinary high-water mark" was employed in other sections of the GLSLA when the Legislature enacted MCL 324.32502 in 1995; we note, however, that the elevations were actually added in 1968 and so any credible argument based on this line of reasoning should use 1968 as a reference point.

lishes the scope of the regulatory authority that the Legislature exercises, pursuant to the public trust doctrine. Indeed, most sections of the act merely regulate the use of land below the ordinary high water mark. [*Glass*, 473 Mich at 683.]

In other words, the scope of respondent's regulatory authority under the GLSLA is not *automatically equivalent* to the scope of the public trust. We conclude that the pertinent statutory wording and the legislative history make clear that the scope of respondent's regulatory authority under the GLSLA should be defined using the listed elevations.

Finally, we conclude that the term "natural" in the statute has an alternative, and reasonable, purpose. The ILASA provides guidance regarding how this adjective should be applied in the context of the present case. Former MCL 281.732(b), as added by 1965 PA 291, stated:

> "Ordinary high water mark" means the line between upland and lake or stream bottom land which persists through successive changes in water levels, and below which the presence and action of the water is so common or recurrent as to mark upon the soil a character, distinct from that which occurs on the upland, as to the soil itself, the configuration of the surface of the soil and the vegetation. In case of an inland lake for which a level has been established by law, it means the high established level. *In case of permanent removal or abandonment of a dam resulting in the water returning to its natural level it means the natural ordinary high water mark.* [Emphasis added.]

The current version of the ILASA contains similar language in MCL 324.30101(m). The ILASA uses the phrase "natural ordinary high water mark" to refer to the specifically defined "[o]rdinary high water mark" as it would exist without alteration by humans. In addition, *Random House Webster's College Dictionary* (1997) defines "natural" as "existing in or formed by nature . . . ." When considering MCL 324.32502, it is logical to conclude that

the Legislature, in defining the phrase "ordinary high-water mark" using specific elevations and, within the same paragraph, modifying that phrase with the adjective "natural," intended the phrase "natural ordinary high-water mark" to refer to the specified elevations as measured by the land in its natural state, unaltered by humans.[4] We adopt this logical conclusion.

In light of the foregoing considerations, we reverse the decision of the circuit court.

Reversed and remanded for further proceedings. We do not retain jurisdiction.

MURPHY, C.J., concurred with METER, J.

GLEICHER, J. (*dissenting*). This case turns on whether the Michigan Legislature intended that state regulation of our Great Lakes shorelines extends to the natural ordinary high-water mark. The majority circumscribes the state's regulatory jurisdiction to fixed elevations above sea level defined by the International Great Lakes Datum (IGLD) for the year 1955, a level that MCL 324.32502 labels an "ordinary high-water mark." Because the Legislature deliberately inserted the word "natural" to delineate the scope of the state's ordinary high-water mark jurisdiction, I respectfully dissent.

In 1995, our Legislature enacted in MCL 324.32501 *et seq.*, the Great Lakes submerged lands act (GLSLA). "[T]he GLSLA establishes the scope of the regulatory authority that the Legislature exercises, pursuant to the public trust doctrine." *Glass v Goeckel*, 473 Mich 667, 683; 703 NW2d 58 (2005). MCL 324.32502, part of

---

[4] A party that filed an amicus curiae brief makes certain arguments concerning how and when the elevations should be measured. We leave this question for another day, when the issue is ripe for review and has been fully briefed by the parties to the appeal.

the GLSLA, commences with a broad designation of
"[t]he lands covered and affected" by the act, generally
describing them as "all of the unpatented lake bottom-
lands and unpatented made lands in the Great Lakes,
including the bays and harbors of the Great Lakes,
belonging to the state or held in trust by it, including
those lands that have been artificially filled in." The
GLSLA then sets forth the core principles governing its
interpretation:

> This part shall be construed so as to preserve and
> protect the interests of the general public in the lands and
> waters described in this section, to provide for the sale,
> lease, exchange, or other disposition of unpatented lands
> and the private or public use of waters over patented and
> unpatented lands, and to permit the filling in of patented
> submerged lands whenever it is determined by the depart-
> ment that the private or public use of those lands and
> waters will not substantially affect the public use of those
> lands and waters for hunting, fishing, swimming, pleasure
> boating, or navigation or that the public trust in the state
> will not be impaired by those agreements for use, sales,
> lease, or other disposition. [MCL 324.32502.]

This sentence underscores the Legislature's intent
that the state serve as a steward of the shores of our
Great Lakes. The sentence's first clause posits, "This
part shall be construed so as to preserve and protect the
interests of the general public in the lands and waters
described in this section . . . ." I cannot envision a
clearer directive. The second clause recognizes the
interests of private littoral owners, but establishes no
rights or entitlements. It merely states that the GLSLA
"provide[s] for the sale, lease, exchange, or other dispo-
sition of unpatented lands and the private or public use
of waters over patented and unpatented lands . . . ."
The third clause returns to the public interest theme
introduced in the first clause, reiterating that although

private owners possess a property right to fill in "patented submerged lands," the exercise of this and other property rights remains contingent on the state's determination

> that the private or public use of those lands and waters will not substantially affect the public use of those lands and waters for hunting, fishing, swimming, pleasure boating, or navigation or that the public trust in the state will not be impaired by those agreements for use, sales, lease, or other disposition.

Preservation of the precious Great Lakes as a public resource animates the Legislature's prescribed construction of the GLSLA.

My construction of the next two sentences of MCL 324.32502 flows directly from the principles guiding the GLSLA's interpretation. After establishing the act's general purview, the Legislature set forth the reach of the state's jurisdiction as follows:

> The word "land" or "lands" as used in this part refers to the aforesaid described unpatented lake bottomlands and unpatented made lands and patented lands in the Great Lakes and the bays and harbors of the great lakes *lying below and lakeward of the natural ordinary high-water mark*, but this part does not affect property rights secured by virtue of a swamp land grant or rights acquired by accretions occurring through natural means or reliction. [*Id.* (emphasis added).]

This language contains no hint of ambiguity. The sentence clearly expresses the meaning that the natural ordinary high-water mark determines the state's regulatory authority. The Legislature selected the natural ordinary high-water mark as the boundary line of state jurisdiction because this reference point most securely safeguards the public's interest in the shores of the Great Lakes.

The natural ordinary high-water mark delineates a distinct point on the land created by the continuous

action of water and evidenced by physical characteristics including the appearance of the soil surface, vegetation changes, and the presence of debris. *Glass*, 473 Mich at 691; 33 CFR 329.11(a)(1). In *Glass*, the Michigan Supreme Court observed that the term "ordinary high-water mark" derives from "the common law of the sea," which governs waters with regular high and low tides. *Glass*, 473 Mich at 690. Despite the absence of tides in the lakes surrounding Michigan, the common law has long applied the term to the Great Lakes in light of the recurrent and sometimes substantial fluctuation in their water levels. *Id.* at 691, 693. The Supreme Court described as follows the legal pedigree of the ordinary high-water mark:

> The concepts behind the term "ordinary high water mark" have remained constant since the state first entered the Union up to the present: boundaries on water are dynamic and water levels in the Great Lakes fluctuate. In light of this, the aforementioned factors will serve to identify the high water mark, but the precise location of the ordinary high water mark at any given site on the shores of our Great Lakes remains a question of fact. [*Id.* at 693-694.]

The natural ordinary high-water mark may prove difficult to locate on a shoreline, but it occupies a firmly entrenched position in the common law.[1]

My interpretation of the term "natural ordinary high-water mark" derives from bedrock principles of statutory construction:

> The Court's responsibility in interpreting a statute is to determine and give effect to the Legislature's intent. The statute's words are the most reliable indicator of the Legislature's intent and should be interpreted based on

---

[1] The parties do not dispute that neither Bobby Burleson nor the Department of Environmental Quality has sought to ascertain the location of the natural ordinary high-water mark on Burleson's property.

their ordinary meaning and the context within which they
are used in the statute. Once the Court discerns the
Legislature's intent, no further judicial construction is
required or permitted because the Legislature is presumed
to have intended the meaning it plainly expressed. [*People
v Lowe*, 484 Mich 718, 721-722; 773 NW2d 1 (2009)
(quotation marks and citation omitted).]

Each word of a statute is "presumed to be made use of
for some purpose, and, so far as possible, effect must be
given to every clause and sentence." *Univ of Mich Bd of
Regents v Auditor General*, 167 Mich 444, 450; 132 NW
1037 (1911). This Court may not substitute or redefine
a word chosen by the Legislature or assume that the
Legislature mistakenly used one word or phrase instead
of another. *Detroit v Redford Twp*, 253 Mich 453, 456;
235 NW 217 (1931); *People v Crucible Steel Co of
America*, 150 Mich 563, 567; 114 NW 350 (1907).

A well recognized rule for construction of statutes is
that when words are adopted having a settled, definite and
well known meaning at common law it is to be assumed
they are used with the sense and meaning which they had
at common law unless a contrary intent is plainly shown.
[*People v Covelesky*, 217 Mich 90, 100; 185 NW 770 (1921).]

In addition,

[a]ll words and phrases shall be construed and understood
according to the common and approved usage of the
language; but technical words and phrases, and such as
may have acquired a peculiar and appropriate meaning in
the law, shall be construed and understood according to
such peculiar and appropriate meaning. [MCL 8.3a.]

In the GLSLA, the Legislature unambiguously se-
lected the "natural ordinary high-water mark" as the
boundary for "[t]he lands covered and affected" by the
act. The Legislature's incorporation of the modifier
"natural" signaled its intent that benchmarks created

by nature, such as eroded soil and altered patterns of vegetation, demarcate the extent of the jurisdiction of the Department of Environmental Quality (DEQ). And given that the term "natural ordinary high-water mark" represents both a centuries-old legal term of art and a concept well known to surveyors, I presume that the Legislature understood the meaning and significance of the language it included in MCL 324.32502.[2]

The last sentence of MCL 324.32502 reads: "For purposes of this part, the ordinary high-water mark shall be at the following elevations above sea level, international Great Lakes datum of 1955: Lake Superior, 601.5 feet; Lakes Michigan and Huron, 579.8 feet; Lake St. Clair, 574.7 feet; and Lake Erie, 571.6 feet." With this sentence, the Legislature introduced a concept distinct from the *natural* ordinary high-water mark. Invoking the IGLD of 1955, the Legislature established a specific reference point for the term "ordinary high-water mark." In my view, a basic understanding of the IGLD of 1955 facilitates a construction of this sentence and illuminates the intended distinction between the natural ordinary high-water mark and the ordinary high-water mark.

---

[2] A 1959 Michigan regulation reinforces my conclusion that the Legislature purposefully chose the term "natural" to delimit the state's ordinary high-water mark jurisdiction:

"Ordinary high water line" shall refer to that *natural* line between the upland and the lake bottom land which persists through periodic changes in water levels and below which the character of the natural soil and vegetation and the profile of the surface of the soil have been affected and worked upon by the waters of the lake at high stages as to make them distinct in character from the upland. This character of the soil, surface shape, or vegetation may be somewhat altered during exposure at low stages in the fluctuations of the water levels, but will be reestablished with the return of high stages. When the soil, vegetation, or shape of the surface have been directly or indirectly altered by man's activity, the ordinary high water line shall be located where it would have occurred had such alteration not taken place. [1959 AACS, R 299.371(a) (emphasis added).]

The IGLD represents "a reference system used for expressing elevations in the Great Lakes area." *State v Trudeau*, 139 Wis 2d 91, 107 n 7; 408 NW2d 337 (1987). A November 1991 "update letter" concerning Great Lakes levels authored by the United States Army Corps of Engineers explains the IGLD as follows:

### What is IGLD 1985?

Because of movement of the earth's crust, the "datum" or elevation reference system used to define water levels within the Great Lakes-St. Lawrence River system must be adjusted every 25 to 35 years. The current datum is known as the International Great Lakes Datum, 1955 (IGLD 1955). The date of the new datum, 1985, is the central year of the period 1982-1988 during which water level information was collected for preparing the datum revision.

### Why is a revised datum required?

Water levels gaging responsibility for the Great Lakes-St. Lawrence River system is shared by the United States and Canada. The harmonious use of these waters requires international coordination of many aspects of their management. The most basic requirement for coordinated management is a common elevation reference or "datum" by which water levels can be measured. [US Army Corps of Engineers, Great Lakes Levels, Update Letter No. 76, November 4, 1991, available at <http://www.lre.usace.armymil/_kd/Items/actions.cfm?action=Show&item_id=3371&destination=ShowItem> (accessed April 20, 2011).]

The "ordinary high-water mark" numbers listed in MCL 324.32502 correspond to each Great Lake's water-surface elevation above sea level, as reported in the 1955 datum. These numbers supply a readily available, unchanging plane of reference for lake elevations, which the Legislature designated "ordinary high-water mark[s]."

I believe it defies logic to equate a static number representing lake-water elevation in 1955 with a "natural" ordinary high-water mark that expressly controls the state's jurisdiction. Instead, the 1955 lake levels and the natural ordinary high-water mark are conceptually distinct. A permanently set elevation linked to 1955 water levels constitutes an artificial location with no connection to "natural" benchmarks. In contrast, the contour of the land surrounding the natural ordinary high-water mark predictably shifts with time, producing ever-changing elevations. Moreover, lake-water elevations above sea level defined by the IGLD embody a vertical plane, while the site of a natural high-water mark suggests a horizontal reference. The natural ordinary high-water mark represents a discernible intersection between the water and the shoreline. But "[t]he most ordinary effect of a large body of water is to change the shore line by deposits or erosion gradually and imperceptibly." *Hilt v Weber*, 252 Mich 198, 219; 233 NW 159 (1930). Because the topography of the Great Lakes shoreline constantly changes, as wind and waves move sand and soil, a fixed elevation may or may not reflect a location landward of the *natural* ordinary high-water mark. Due to shifting shorelines and varying beach elevations, a static elevation of 579.8 feet may denote the top of a sand dune in one year, while being underwater the next.

Unlike the majority, I credit our Legislature with awareness of the critical difference between a natural ordinary high-water mark impressed on the land notwithstanding varying water levels and shifting shore topography and unchanging numbers signifying lake-water elevations. Consequently, it does not strain my "credulity and common sense to conclude that phrases as similar as 'natural ordinary high-water mark' and 'ordinary high-water mark,' employed within the same

statutory paragraph, were intended by the Legislature to encompass" very different meanings. *Ante* at 551. Rather, I believe that the Legislature inserted the word "natural" because it intended to distinguish between an unchanging line in the sand and the reality of our dynamic Great Lakes shorelines. Because a fundamental difference exists between the meanings of the two terms, I cannot accept that the Legislature accidentally inserted the word "natural" into MCL 324.32502 to describe the lands subject to state jurisdiction or that the Legislature inadvertently omitted the word "natural" from the statute's last sentence.

Nor do I find troubling the specter of "serious difficulties concerning *why* the statutory elevations were included in MCL 324.32502 in the first instance." *Ante* at 551. As the majority recognizes, the Legislature employed the term "ordinary high-water mark" elsewhere in the GLSLA. When the Legislature enacted MCL 324.32502 in 1995, the term "ordinary high-water mark" appeared in at least two other sections of the GLSLA: MCL 324.32503(3), as amended by 2002 PA 148 ("The department shall not enter into a lease or deed of unpatented lands that permits drilling for exploration purposes unless the drilling operations originate from locations above and inland of the ordinary high-water mark."), and MCL 324.32513(2)(a)(*ii*), as amended by 2003 PA 163 ("For . . . a permit for . . . the mowing of vegetation in excess of what is allowed in section 32512(2)(a)(*ii*), in the area between the ordinary high-water mark and the water's edge, a fee of $50.00.").[3]

---

[3] It also seems reasonable to conclude that when the Legislature enacted the GLSLA, it intended that future regulatory provisions would use the ordinary high-water mark instead of the natural ordinary high-water mark. Indeed, this is precisely what occurred when the Legislature enacted MCL 324.32501(b), MCL 324.32512, MCL 324.32512a(3), MCL 324.32513, and MCL 324.32516.

Furthermore, I disagree with the majority's analysis of the portion of the statutory language addressing property rights acquired "by accretions occurring through natural means or reliction." MCL 324.32502. After defining the word "land" in the penultimate sentence of MCL 324.32502 as including "patented lands in the Great Lakes and the bays and harbors of the great lakes lying below and lakeward of the natural ordinary high-water mark," the Legislature added "but this part does not affect property rights secured by virtue of a swamp land grant or rights acquired by accretions occurring through natural means or reliction." The majority opines, "If the [natural ordinary high-water mark] were independent of the listed elevations and defined in accordance with [the DEQ's] interpretation, then the 'reliction exception' would be superfluous because relicted lands would, by definition, fall outside the boundary of the [natural ordinary high-water mark] as defined by [the DEQ]." *Ante* at 552. However, the majority has read out of the statute the words "affect property rights." Littoral owners possess property rights in land *subject to state regulation*. Regardless of whether the surface of a property owner's fast land expands with reliction or contracts through erosion, exercise of state regulatory powers does not negate ownership. See Abrams, *Walking the beach to the core of sovereignty: The historic basis for the public trust doctrine applied in* Glass v Goeckel, 40 U Mich J L Reform 861, 899-902 (2007). As the Supreme Court observed in *Glass*, the state's "status as trustee does not permit the state, through any of its branches of government, to secure to itself property rights held by littoral owners." *Glass*, 473 Mich at 694. Relicted land below the natural ordinary high-water mark may remain subject to private ownership. But "land-use regulation does not effect a taking if it substantially advances legitimate state interests and does not deny an owner economically viable use of his land."

*Nollan v California Coastal Comm*, 483 US 825, 834; 107 S Ct 3141; 97 L Ed 2d 677 (1987) (quotation marks and citation omitted). Just as "public rights may overlap with private title," *Glass*, 473 Mich at 700, the state's regulatory jurisdiction may overlie property rights. In my view, the language "this part does not affect property rights secured by virtue of a swamp land grant or rights acquired by accretions occurring through natural means or reliction" in MCL 324.32502 means simply that, irrespective of the location of the natural ordinary high-water mark, relicted land remains the property of the fee owner, rather than vesting in the state.

Finally, I agree with Burleson that the use of a fixed elevation enhances predictable regulatory boundaries. Yet by selecting the word "natural," the Legislature opted to link the state's regulatory realm to the reality of an ever-changing environment. In accordance with the Legislature's command that preservation and protection of the Great Lakes must guide interpretation of the GLSLA, I reject the idea that the Legislature intended that an elevation corresponding to the water's edge in 1955 would forever limit the state's ability to protect our beaches.

I would affirm the circuit court's order upholding the DEQ's declaratory ruling.