# STATE OF MICHIGAN

# COURT OF APPEALS

PORT SHELDON BEACH ASSOCIATION,

Plaintiff-Appellant,

v

DEPARTMENT OF ENVIRONMENTAL
QUALITY,

Defendant-Appellee.

FOR PUBLICATION
December 13, 2016
9:10 a.m.

No. 328483
Court of Claims
LC No. 14-000288-MZ

Before: M. J. KELLY, P.J., and O'CONNELL and BECKERING, JJ.

PER CURIAM.

In this case involving the boundary of a critical dune area, plaintiff Port Sheldon Beach Association (the Association) appeals as of right from a Court of Claims order granting summary disposition in favor of defendant Department of Environmental Quality under MCR 2.116 (C)(10) (no genuine issue of material fact) and (I)(2) (opposing party entitled to judgment). For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

The Association is a nonprofit corporation organized and operated as a summer resort and park association pursuant to MCL 455.1, *et seq*. Located in Port Sheldon Township, the Association owns three undeveloped beach parcels between the developed, residential portion of its resort and the shore of Lake Michigan. The western border of the Association's properties is on Lake Michigan. All three of the Association's parcels bordering Lake Michigan are undisputedly subject to the Sand Dune Protection and Management Act (SDPMA), MCL 324.35301 *et seq*.

The SDPMA was enacted in 1976 in order to regulate sand dune mining in designated sand dune areas near the Great Lakes shoreline. 1976 PA 222; MCL 281.651 to MCL 281.664, recodified at MCL 324.63701 to MCL 324.63714.[1] Relevant to this appeal, the SDPMA

---

[1] The Legislature amended the original SDPMA in 1989 to regulate other activities within the sand dune areas (in addition to mining). 1989 PA 146 and 147. Further amendments to the SDPMA occurred in 1994. 1994 PA 135. That same year, all environmental protection acts,

-1-

provides that certain areas of Michigan were critical dune areas (CDAs). The Act defines the term CDA as "a geographic area designated in the 'atlas of critical dune areas' dated February 1989 . . . ." MCL 324.35301(c). The 1989 Atlas of Critical Dune Areas (the 1989 Atlas) is essentially a collection of maps, organized by township, with each map showing the location of the CDAs for that township. At issue in this case is the CDA located in Port Sheldon Township, which is shown on the Port Sheldon Township map in the 1989 Atlas.[2] According to the Association, since 1989 the shoreline of Lake Michigan has moved considerably further out to the west, by at least 150 feet, and the change in the shoreline is not from reliction (recession of water) but from the beach growing by accretion.[3] The Association wanted to remove dune grass and groom a portion of its property, but was advised by the DEQ that it could not do so because the area was within the CDA.

In December 2014, the Association filed the instant suit. The parties moved for summary disposition. The Association argued that the western boundary, i.e., the lakeward boundary, of the CDA was fixed, and thus the new sand that had accreted to the west of that fixed boundary was not subject to the SDPMA because it was not part of the CDA. The DEQ argued that the CDA boundary extends to the shore of Lake Michigan and, as a result, the "new" accreted land in the gap between the "old" shoreline in the 1989 Atlas and the current shoreline of Lake Michigan is subject to the SDPMA.

---

including the SDPMA, were recodified into the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq*. 1994 PA 451, as amended. The recodification resulted in the bifurcation of the SDPMA, with the provisions concerning the regulation of these new activities becoming Part 353, Sand Dunes Protection and Management, MCL 324.35301 *et seq*., and the provisions concerning the regulation of mining becoming Part 637, the Sand Dune Mining Act, MCL 324.63701 *et seq*.

[2] An index of the maps contained in the 1989 Atlas is available online. <https://www.michigan.gov/deq/0,4561,7-135-3311_4114_4236-70207--,00.html> (accessed December 2, 2016). There is also a statewide map showing the distribution of all the CDAs. <https://www.michigan.gov/documents/deq/lwm_sanddunes_statewide_CDA_262858_7.pdf> (accessed December 2, 2016). The Port Sheldon Township map can be viewed online. <https://www.michigan.gov/documents/deq/sanddunes_port_sheldon_twp_262823_7.pdf> (accessed December 2, 2016). The lines encompassing the CDAs in the 1989 Atlas were hand drawn on Michigan Resource Information System base maps. <http://www.mcgi.state.mi.us/mgdl/Critical_Dunes/metadata/critical_dune.htm> (accessed December 2, 2016).

[3] The Association asserts that the accretion was caused by jetties that were built in the mid-1960s that start at the mouth of the Pigeon Lake channel and extend out into Lake Michigan. As sand drifts along the shoreline it becomes trapped by the jetties and accumulates. Regardless of whether the accretion was caused by jetties or for some other reason, it is undisputed that the shoreline has been extended since the 1989 Atlas was incorporated into the SDPMA.

The Court of Claims granted summary disposition in the DEQ's favor, reasoning as follows:

> This Court agrees with [the DEQ's] interpretation of the atlas as incorporated into MCL 324.3530l(c); the Court is not persuaded that the atlas designated a CDA with a fixed western edge on the shoreline. The map is drawn to show that the area designated by the atlas as CDA extends to the water's edge. The edge of the CDA as depicted appears like a meander line along the lake. "When a plat shows a lot is bounded by the meander line of a lake, the grant of land is to the water's edge." *Mumaugh v McCarley*, 219 Mich App 641, 649; 558 NW2d 433 (1996), citing *Gregory v LaFaive*, 172 Mich App 354, 361; 431 NW2d 511 (1988). In a similar way, where the atlas used a meander line with respect to the CDA, the designated CDA extends to the water's edge, even as the waterline fluctuates.

The Association filed a motion for reconsideration, which was denied. This appeal follows.

## II. BOUNDARY OF THE CRITICAL DUNE AREA

### A. STANDARD OF REVIEW

The Association argues that the lower court erred in granting summary disposition in favor of the DEQ. A trial court's decision whether to grant a motion for summary disposition is reviewed de novo, *Brown v Brown*, 478 Mich 545, 551; 739 NW2d 313 (2007), as is the proper interpretation of a statute is a question of law that this Court reviews de novo, *Burleson v Dep't of Environmental Quality*, 292 Mich App 544, 548; 808 NW2d 792 (2011). Although an agency interpretation of a statute is not binding on this Court, "the construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration and ought not to be overruled without cogent reasons." *Id*. (citation omitted).

### B. ANALYSIS

The issue is whether the western border of the CDA as depicted on the Port Sheldon Township map is a fixed boundary line or a meander line.[4] Resolution of the issue requires us to interpret the SDPMA and more specifically, the Port Sheldon Township map that is incorporated into the statute by virtue of its inclusion in the 1989 Atlas. A meander line does not constitute a boundary line. It is an artificial line to describe the "meandering" course of a body of water (typically a river or stream, but also a lake's shoreline), and it indicates that the boundary is the water's edge. See *Farabaugh v Rhode*, 305 Mich 234, 242; 9 NW2d 562 (1943) ("[T]he meander line of Lake Michigan is a line of description and not one of boundary . . . ."); See *Hilt*

---

[4] Although cases discussing meander lines typically do so in relation to a property conveyance to determine whether the property conveyed has riparian rights, it is equally applicable in this case where a survey of the dunes was performed and the relevant map shows Lake Michigan to be one of the boundaries.

*v Weber*, 252 Mich 198, 208-209; 233 NW 159 (1930). If a surveyor does not use a meander line, the boundary line is fixed and constant. See *Black's Law Dictionary* (9th ed), p 1069 (defining "meander line"). Thus, if the western line of the CDA as depicted on the Port Sheldon Township map is a meander line, then the water's edge of Lake Michigan is the true western boundary of the CDA. *Porter v Selleck*, 236 Mich 655, 661; 211 NW 261 (1926) (citation omitted) ("It has been decided again and again that the meander line is not a boundary, but that the body of water whose margin is meandered is the true boundary."). Conversely, if the line is a fixed boundary line, then the strip of land between the line depicted on the Port Sheldon Township map and the water's edge is not part of the CDA and is accordingly not subject to the SDPMA.

The primary goal of statutory interpretation is to identify and give effect to the intent of the Legislature. *Booker v Shannon*, 285 Mich App 573, 575; 776 NW2d 411 (2009) (citation omitted). We first look to the specific language of the statute in determining the intent of the Legislature. *People v Droog*, 282 Mich App 68, 70; 761 NW2d 822 (2009). In this case, the statutory language is silent with regard to whether the western border on the Port Sheldon Township map is meant to be a fixed boundary or whether it is meant to be treated as a meander line. However, the Legislature incorporated the 1989 Atlas into the statute, and the statute contains a map depicting the boundary lines for the CDA at issue in this case. "When interpreting deeds and plats, Michigan courts seek to effectuate the intent of those who created them." *Tomecek v Bavas*, 482 Mich 484, 490-491; 759 NW2d 178 (2008) (opinion by KELLY, J). "It is a well-established rule of statutory construction that provisions of a statute must be construed in light of the other provisions of the statute to carry out the apparent purpose of the Legislature." *Farrington v Total Petroleum, Inc*, 442 Mich 201, 209; 501 NW2d 76 (1993). Further, "[t]he changes in an act must be construed in light of the act's predecessor statutes and the law's historical development." *Huron Behavioral Health v Dep't of Community Health*, 293 Mich App 491, 498; 813 NW2d 763 (2011).

Review of the maps contained in the 1989 Atlas shows three situations. First, like the Port Sheldon Township map, the overwhelming majority of the township maps show that the lakeward line is precisely the same as the shoreline of the bordering Great Lake. Second, for a number of township maps, there is some land between the boundary line between the CDA and the shoreline of the bordering Great Lake.[5] Finally, in a few townships, the lakeward boundary

---

[5] See the maps for Wawatam Township, Bay Mills Township, Bear Creek and Little Traverse Townships, and Leelanau Township maps: <https://www.michigan.gov/documents/deq/lwm_sanddunes_wawatam_twp_262871_7.pdf> (accessed December 2, 2016); < https://www.michigan.gov/documents/deq/sanddunes_bay_mills_twp_262180_7.pdf> (accessed December 2, 2016); <https://www.michigan.gov/documents/deq/lwm_sanddunes_bear_creek_little_traverse_twp_26 2188_7.pdf> (accessed December 2, 2016); <https://www.michigan.gov/documents/deq/lwm_sanddunes_leelanau_twp_C_267489_7.pdf> (accessed December 2, 2016).

line extends beyond the shoreline and slightly into the water of the bordering Great Lake.[6] From this, it is plain that the Legislature expressly intended that in particular instances, the CDAs would not extend to the water's edge, whereas in other situations the CDA was intended to be on the water's edge or beyond the water's edge. Given that the map in this case unambiguously shows that the lakeward boundary extends to the water's edge, it is plain that the Legislature did not intend the lakeward boundary line to be fixed, but instead intended it to be at the water's edge as depicted. See *St Clair Co v Lovingston*, 90 US 46, 63; 23 L Ed 59 (1874) ("Where a survey and patent show a river to be one of the boundaries of the tract, it is a legal deduction that there is no vacant land left for appropriation between the river and the river boundary of such tract.").

The Association makes several arguments as to why, contrary to the map showing the lakeward boundary at the water's edge, the Legislature unambiguously intended that the lakeward boundary line was fixed, so in light of the subsequent changes in the shoreline the western boundary line no longer extends to the water's edge. We address each in turn.

First, the Association argues that the Legislature's use of the word "designated" when defining a CDA shows that the action of designating an area as a CDA was finished when the statute was enacted. See MCL 324.35301(c) (providing that a CDA is "a geographic area designated in the 'atlas of critical dune areas' dated February 1989 . . . ."). Although the past tense use of the word "designated" does imply an action that is complete, what was designated was depicted in the 1989 Atlas, which, as we have already noted, unambiguously provides that the lakeward boundary extends to the water's edge. By contrast, as noted above, the areas designated for some other townships did not extend to the water's edge.

Second, the Association also argues that interpreting a line placed precisely on the margin of Lake Michigan as a meander line is precluded because the SDPMA specifically provides mechanisms for adjusting CDA boundaries. In support, the Association directs us to MCL 324.35311, which provides:

> Beginning with the effective date of the 2012 act that amended this section and once every 10 years thereafter, the department may appoint a team of qualified ecologists, who may be employed by the department or may be persons with whom the department enters into contracts, to review "the atlas of critical dune areas" dated February 1989. The review team shall evaluate the accuracy of the designations of critical dune areas within the atlas and shall recommend to the legislature any changes to the atlas or underlying criteria revisions to the atlas that would provide more precise protection to the targeted resource.

---

[6] See Gilmore and Blaine Townships map. <https://www.michigan.gov/documents/deq/lwm_sanddunes_gilmore_blaine_twp_262051_7.pdf > (accessed December 2, 2016); and Crystal Lake Township map <https://www.michigan.gov/documents/deq/lwm_sanddunes_crystal_lake_twp_262008_7.pdf> (accessed December 2, 2016).

The DEQ, however, has no authority under this provision to adjust a CDA's boundaries. Instead, this provision allows the DEQ to appoint qualified experts to evaluate the accuracy of the 1989 Atlas and then *recommend* changes that improve its accuracy to the Legislature. The Legislature, however, is under no obligation to accept the changes. Moreover, given that this section was enacted in 2012, we do not find it persuasive as to whether the Legislature originally intended the lakeward boundary line to run along the water's edge even if the exact boundary of the water's edge moved.

Next, the Association argues that MCL 324.35312(3) and (4) allow the DEQ to extend the CDA, which shows that the Legislature contemplated a fixed boundary. MCL 324.35312(3) and (4) provide:

> (3) A local unit of government may by an affirmative vote of its governing body following a public hearing regulate additional lands as critical dune areas under this part as considered appropriate by the planning commission if the lands are determined by the local unit of government to be essential to the hydrology, ecology, topography, or integrity of a critical dune area. A local unit of government shall provide within its zoning ordinance for the protection of lands that are within 250 feet of a critical dune area, if those lands are determined by the local unit of government to be essential to the hydrology, ecology, topography, or integrity of a critical dune area.

> (4) If a local unit of government does not have an approved zoning ordinance, the department may regulate additional lands described in subsection (3). However, the lands added by the department shall not extend more than 250 feet from the *landward boundary* of a critical dune area, unless, following a public hearing, an affirmative vote of the governing body of the local unit of government authorizes a further extension. If the director determines that the mapping of a critical dune area designated in the "atlas of critical dune areas" dated February 1989 was inaccurate, the department may regulate additional lands. However, the lands added by the department shall not extend more than 250 feet from the *landward boundary* of a critical dune area. [Emphasis added.]

Pursuant to the first sentence of MCL 324.35312(3), based on a recommendation from the planning commission, and provided the statutory procedural requirements are satisfied, the local unit may regulate "additional lands as critical dune areas" so long as they are essential to the hydrology, ecology, topography, or integrity of a CDA. The second sentence of MCL 324.35312(3) requires a local unit to establish a zoning ordinance to provide for the protection of "lands that are within 250 feet" of a CDA if the local unit determines that "those lands" are essential to the hydrology, ecology, topography, or integrity of a CDA. The "additional lands" that can be regulated pursuant to the first sentence are limited only by the requirement that they are essential to a CDA. Those lands do not have to be within 250 feet or within any range; their protection is identical to the protection afforded to a CDA so long as they are essential to a CDA. Under the second sentence, the local unit unilaterally determines if lands that are within 250 feet of a CDA are essential to a CDA. If so, that will trigger "the protection" in the local zoning ordinance. Only lands within 250 feet of a CDA can receive "the protection," the extent of which is established in the zoning ordinance and not by reference to CDA protections as in the

first sentence. Finally, under the second sentence, the 250-foot limit extends around the entire boundary of the CDA.

MCL 324.35312(4) authorizes the DEQ to regulate "additional lands" from subsection (3) if a local unit lacks an approved zoning ordinance. "Additional lands" means the land "described" in the first sentence of subsection (3). However, the subsection (4) "additional lands" cannot extend more than 250 feet from the landward boundary (as opposed to the lakeward boundary) of a CDA, unless the local unit authorizes further extension. The statute also permits the DEQ to regulate "additional land" not extending more than 250 feet from the landward boundary of a CDA, if it determines that the 1989 Atlas contains an inaccurately mapped CDA. Thus, under these statutory provisions, the DEQ only has a limited ability to extend the boundaries of a CDA. Because subsection (4) only allows an extension from the *landward* boundary, it is plain that the DEQ *cannot* add land on the lakeward boundary under the guise of "extending" the landward boundary towards the shore.

The Association next argues that the trial court allowed the DEQ to bring this property under its CDA jurisdiction without any showing that it qualifies as the type of unique, irreplaceable, fragile resource that the PDCMA was intended to protect.[7] However, given that the Legislature clearly intended the CDA to extend to the water's edge, we see no reason for the DEQ to establish that the areas so designated by the Legislature meet protective rationale set forth in MCL 324.35302(a).

The Association also argues the situation in this case is similar to the pier-related beaches in Holland and Grand Haven, both of which the Legislature expressly omitted from the 1989 Atlas. However, given that the Legislature expressly omitted those beaches, whereas for the property in question in this case, the Legislature depicted the boundary extending to the water's edge. We do not find reference to the situation in Holland and Grand Haven applicable.

The Association also suggests that, because the DEQ's website and other resources show the property at issue with the lines from the 1989 Atlas, rather than the "real" lines that go to the current water's edge, the DEQ has attempted to perpetrate a fraud on the public, pretending the CDA boundaries were in one location while secretly hiding a more expansive interpretation to be used when convenient. However, all of these materials came with disclaimers and were not presented as absolutely accurate and authoritative, so the Association did not reasonably rely on these materials to its detriment. Moreover, these documents all show the 1989 Atlas boundaries, which contain lines that were placed precisely on the margin of Lake Michigan.

---

[7] MCL 324.35302 provides:

> (a) The critical dune areas of this state are a unique, irreplaceable, and fragile resource that provide significant recreational, economic, scientific, geological, scenic, botanical, educational, agricultural, and ecological benefits to the people of this state and to people from other states and countries who visit this resource. [MCL 324.35302, as amended by 2012 PA 297.]

Finally, in its reply brief the Association argues that "the Atlas depicts supposedly flexible lakeshore CDA boundaries in the exact same way it depicts supposedly inflexible non-lakeshore CDA boundaries." It also asserts that this Court must treat the boundaries in the 1989 Atlas as fixed or it is an impermissible subsequent amendment to the 1989 Atlas. However, the Association's argument overlooks that if the Legislature intended the lines placed precisely on the margin of Lake Michigan to set the boundary at Lake Michigan, then nothing has changed with that document since 1989.

Affirmed.

/s/ Michael J. Kelly
/s/ Peter D. O'Connell
/s/ Jane M. Beckering